SMYTH, EXECUTOR, *v.* UNITED STATES.*

No. 42.  Argued November 18, 19, 1937.—Decided December 13, 1937.

---

* Together with No. 43, *Dixie Terminal Co.* v. *United States,* also on writ of certiorari to the Court of Claims; and No. 198, *United States* ·v. *Machen,* on writ of certiorari to the Circuit Court of Appeals for the Fourth Circuit.

330

*Mr. Robert A. Taft* for petitioners in Nos. 42 and 43.

334

338

340

*Solicitor General Reed*, with whom *Attorney General Cummings, Assistant Attorney General Whitaker,* and *Messrs. Harry LeRoy Jones, Edward First, Clarence V. Opper,* and *Bernard Bernstein* were on the brief, for the United States.

342

344

*Mr. H. Vernon Eney* for Machen, respondent in No. 198.

348

Opinion of the Court by MR. JUSTICE CARDOZO, announced by the CHIEF JUSTICE.

Three cases present a single question: Was a notice of call issued by the Secretary of the Treasury for the redemption of Liberty Loan bonds effective to terminate

the running of interest on the bonds from the designated redemption date?

Petitioner in No. 42 is the owner of a $10,000 First Liberty Loan 3½% bond of 1932–1947, serial number 6670. The bond was issued pursuant to the Act of April 24, 1917 (40 Stat. 35), and Treasury Department Circular No. 78, dated May 14, 1917, and was purchased by petitioner in December, 1934, for $10,362.50 and accrued interest. Its provisions, so far as material, read as follows:

"The United States of America for value received promises to pay to the bearer the sum of Ten Thousand Dollars on the 15th day of June, 1947, with interest at the rate of three and one-half per centum per annum payable semi-annually on December 15 and June 15 in each year until the principal hereof shall be payable, upon presentation and surrender of the interest coupons hereto attached as they severally mature. The principal and interest of this bond shall be payable in United States gold coin of the present standard of value, . . . All or any of the bonds of the series of which this is one may be redeemed and paid at the pleasure of the United States on or after June 15, 1932, or on any semi-annual interest payment date or dates, at the face value thereof and interest accrued at the date of redemption, on notice published at least three months prior to the redemption date, and published thereafter from time to time during said three months period as the Secretary of the Treasury shall direct. . . . From the date of redemption designated in any such notice interest on the bonds called for redemption shall cease, and all coupons thereon maturing after said date shall be void. . . ."

On March 14, 1935, the Secretary of the Treasury published a notice of call for the redemption on June 15, 1935, of all the bonds so issued. "Public notice is hereby given:

1. All outstanding First Liberty Loan bonds of 1932–47 are hereby called for redemption on June 15, 1935. The

various issues of First Liberty Loan bonds (all of which are included in this call) are as follows:

First Liberty Loan 3½ percent bonds of 1932–47 (First 3½'s), dated June 15, 1917; . . .

2. Interest on all such outstanding First Liberty Loan bonds will cease on said redemption date, June 15, 1935."

Thereafter, on April 22, 1935, the Secretary of the Treasury issued a circular (Department Circular, No. 535) prescribing rules for the redemption of First Liberty Loan bonds, and providing, among other things, as follows: "Holders of any outstanding First Liberty Loan bonds will be entitled to have such bonds redeemed and paid at par on June 15, 1935, with interest in full to that date. After June 15, 1935, interest will not accrue on any First Liberty Loan bonds."

Nearly two years before the publication of the notice of call Congress had adopted the Joint Resolution of June 5, 1933 (48 Stat. 112) by which every obligation purporting to be payable in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, was to be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment was legal tender for public and private debts. Nearly four weeks before the publication of the notice of call, the validity of that Joint Resolution had been the subject of adjudication by this court in the Gold Clause Cases, *Norman* v. *Baltimore & Ohio R. Co.*, 294 U. S. 240, *Nortz* v. *United States*, 294 U. S. 317, and *Perry* v. *United States*, 294 U. S. 330, all decided February 18, 1935. We may presume that the call was issued with knowledge of those rulings.

About six months after the date designated for redemption, petitioner, on December 28, 1935, presented his bond (with coupons due on and before June 15, 1935, detached) to the Treasurer of the United States, and demanded the redemption by the payment of 10,000 gold dollars each

containing 25.8 grains of gold nine-tenths fine, which was
the gold content of a dollar in 1917. The Treasurer re-
fused to comply with that demand, but offered payment
of the face amount of the principal in legal tender coin
or currency other than gold or gold certificates. Peti-
tioner declined to accept the tender and retained the
bond. Thereafter, on the same day, petitioner presented
to the Treasurer of the United States, the interest coupon
for the six months period June 15 to December 15, 1935,
and demanded payment either in gold coin or legal tender
currency. The Treasurer refused payment on the ground
that the bond to which the coupon was attached had been
called for redemption on June 15, 1935.

An action followed in the Court of Claims, petitioner
resting his claim upon the interest coupon only, and lim-
iting his demand to a recovery in current dollars.[1] The
Court gave judgment for the United States on the ground
that on the designated redemption date, all coupons for
later interest became void. Because of the important
interests, public and private, affected by the judgment,
a writ of certiorari was granted by this court.

Petitioner in No. 43 is the owner of a $50 Fourth
Liberty Loan 4½% bond of 1933–1938, which it bought
on March 9, 1935. The bond was issued pursuant to the
Act of September 24, 1917 (40 Stat. 288) as amended,
and Treasury Department Circular, No. 121. It was to
mature on October 15, 1938, subject, however, to re-

---

[1] The Joint Resolution of Aug. 27, 1935 (49 Stat. 938, 939), with-
drawing the consent of the United States to suit where the claimant
asserted against it a right, privilege or power "upon any gold-clause
securities of the United States or for interest thereon" makes an
exception of any suit begun by January 1, 1936, as well as any pro-
ceeding "in which no claim is made for payment or credit in an
amount in excess of the face or nominal value in dollars of the securi-
ties, coins or currencies of the United States involved in such pro-
ceeding." Petitioner has brought himself within each branch of the
exception.

demption on October 15, 1933 or later. The terms of redemption are stated in Circular No. 121, which is incorporated by reference into the bond itself. Six months notice by the Secretary of the Treasury was required, "From the date of redemption designated in any such notice, interest on bonds called for redemption shall cease." On October 12, 1933, the Secretary of the Treasury published a notice of call for redemption on April 15, 1934, of certain bonds of this issue. The bond now owned by petitioner is one of them. There were tenders and refusals similar to those described already in the statement of the other case. An action followed in the Court of Claims. Petitioner prayed for judgment in the sum of $1.07, the amount of the interest coupon for the six months period ending October 15, 1934.[2] The court dismissed the claim and the case is here on certiorari.

Respondent in No. 198 is the owner of a $1,000 First Liberty Loan $3\frac{1}{2}\%$ bond of 1932-1947, No. 47084, purchased on March 22, 1933, for $1,011.25. This is the same bond issue involved and described in No. 42. Respondent did not present his bond for payment either on the redemption date or later. He did not present the coupon which is the foundation of the suit. However, the fact is stipulated that the Treasurer of the United States and other fiscal agents have not at any time been directed by the Secretary of the Treasury to redeem the bonds in gold coin, but have been authorized and directed to redeem in legal tender currency. The fact is also stipulated that there was a refusal to pay similar coupons for interest accruing after the date of redemption. Respondent brought suit upon his coupon in the United States Dis-

---

[2] The coupon reads as follows: "The United States of America will pay to bearer on October 15, 1934, at the Treasury Department, Washington, or at a designated agency, $1.07, being six months' interest then due on $50 Fourth Liberty Loan $4\frac{1}{4}\%$ Gold Bonds of 1933-1938 unless called for previous redemption."

trict Court for the District of Maryland. The District Court gave judgment in favor of the United States. The Court of Appeals for the Fourth Circuit reversed and ordered a new trial (87 F. (2d) 594), declining to follow the ruling which had been made by the Court of Claims. The case is here on certiorari on the petition of the Government.

Hereafter, for convenience of reference, the bondholder in each of the three cases will be spoken of as a "petitioner," without adverting to the fact that in one of them (No. 198) he is actually a respondent.

*First.* The so-called redemption provisions of the bonds are provisions for the acceleration of maturity at the pleasure of the Government, and upon publication of the notice of call for the period stated in the bonds the new date became substituted for the old one as if there from the beginning.

The contract is explicit. "From the date of redemption designated in any such notice interest on the bonds called for redemption shall cease, and all coupons thereon maturing after said date shall be void." The contract is not to the effect that interest shall cease upon or after payment. Cf. *Sterling* v. *H. F. Watson Co.,* 241 Pa. 105, 110; 88 Atl. 297. The contract is that interest shall cease upon the date "designated" for payment. The rule is established that in the absence of contract or statute evincing a contrary intention, interest does not run upon claims against the Government even though there has been default in the payment of the principal. *U. S. ex rel. Angarica* v. *Bayard,* 127 U. S. 251; *United States* v. *North Carolina,* 136 U. S. 211; *United States* v. *North American T. & T. Co.,* 253 U. S. 330, 336; *Seaboard Air Line Ry.* v. *United States,* 261 U. S. 299, 304. The allowance of interest in eminent domain cases is only an apparent exception, which has its origin in the Constitution. *Shoshone Tribe* v. *United States,* 299 U. S. 476, 497;

*United States* v. *Rogers*, 255 U. S. 163, 169. If the bonds in suit had matured at the date of natural expiration, interest would automatically have ended, whether the bonds were paid or not. Maturity at a different and accelerated date does not make the obligation greater. In the one case as in the other the interest obligation ends, and this for the simple reason that the contract says that it shall end. Upon non-payment of principal at the original maturity, the bondholder, if unpaid, has a remedy by suit to recover principal, with interest then overdue, but not interest thereafter. Upon non-payment of principal at the accelerated date, he has a like remedy, but no other. Default, if there has been any, is as ineffective in one situation as in the other to keep interest alive.

Petitioners insist, however, that the notices of call were not adequate to accelerate maturity, with the result that interest continued as if notice had not been given. This surely is not so if we look to form alone and put extrinsic facts aside. "All outstanding First Liberty Loan bonds of 1932–47 are hereby called for redemption on June 15, 1935." "All outstanding Fourth Liberty Loan 4¼ per cent bonds of 1933–38, hereinafter referred to as Fourth 4¼'s, bearing the serial numbers which have been determined by lot in the manner prescribed by the Secretary of the Treasury, are called for redemption on April 15, 1934, as follows," (the serial numbers being thereupon stated). Nothing could be simpler, nothing more clearly adequate, unless the notices are to be supplemented by resort to extrinsic facts, the subject of judicial notice, which neutralize their terms. Petitioners maintain that such extrinsic facts exist. In their view, each of the two forms of notice must be read as if it incorporated within itself the Joint Resolution of June 5, 1933, and promised payment in the manner called for by that Resolution, and not in any other way. Thus supplemented, we are told, the notice is a nullity, for the payment that it promises is not the payment owing under the letter of the bond.

The notice of call for the redemption of the bonds was a notice, not a promise. The Secretary of the Treasury was not under a duty to make any promise as to the medium of payment. He did not undertake to make any. The obligation devolving upon the United States at the designated date was measured by the law, and the law includes the Constitution as well as statutes and resolutions. The medium of payment lawful at the time of issuing the call might be different from that prevailing at the accelerated maturity. This might happen as a consequence of an amendment of the statute. It might happen through judicial decisions adjudging a statute valid and equally through judicial decisions adjudging a statute void. The interval between notice and redemption was three months in the case of the First Liberty bonds; it was six months for the Fourth. The Secretary of the Treasury understood these possibilities when he sent out his notices for the redemption of the bonds in suit. Indeed, *Perry* v. *United States, supra,* had already been decided when bonds of the First Liberty issue were made the subject of his call. In each form of notice the implications of the call are clear. What the bondholders were told was neither more nor less than this, that at the accelerated maturity they would be entitled to payment in such form and in such measure as would discharge the obligation. The Secretary's beliefs or expectations as to what the proper form or measure would be at the appointed time are of no controlling importance, even if they were shown. The obligation was not his; it was that of the United States. His own beliefs and expectations and even those of the Government might be changed or frustrated by subsequent events. The bondholders had the assurance that the bonds would be redeemed, and they were entitled to no other. Whatever medium of payment would discharge the obligation if maturity had been attained through the natural lapse of time would dis-

charge it as completely at an accelerated maturity. The same money that would "pay" would serve also to "redeem." There is no reason to believe that the one situation was distinguished from the other in the minds of the contracting parties. The sum total of existing law— Constitution and statutes and even controlling decisions, if there were any—would say how much was due.

If this analysis is sound, it carries with it the conclusion that the call did not commit the Government either expressly or by indirection to a forbidden medium of payment. The case for the petitioners, if valid, must rest upon some other basis. A suggested basis is that the existence of the Joint Resolution amounted without more to an anticipatory breach, which made the notice of redemption void from its inception, if there was an election so to treat it, and this though the notice left the medium of payment open. But the rule of law is settled that the doctrine of anticipatory breach has in general no application to unilateral contracts, and particularly to such contracts for the payment of money only. *Roehm* v. *Horst*, 178 U. S. 1, 17; *Nichols* v. *Scranton Steel Co.*, 137 N. Y. 471, 487; 33 N. E. 561; *Kelly* v. *Security Mutual Life Ins. Co.*, 186 N. Y. 16; 78 N. E. 584; Williston, Contracts, rev. ed., vol. 5, § 1328; Restatement, Contracts, §§ 316, 318. Whatever exceptions have been recognized do not touch the case at hand. *New York Life Ins. Co.* v. *Viglas*, 297 U. S. 672, 679, 680. Moreover, an anticipatory breach, if it were made out, could have no effect upon the right of the complaining bondholders to postpone the time of payment to the date of natural maturity. The sole effect, if any, would be to clothe them with a privilege to declare payment overdue, which is precisely the result that they are seeking to avoid. The conclusion therefore follows that for the purpose of the present controversy the breach would be immaterial even if it were not unreal. But its unreality is the feature we

prefer to dwell upon. The Government was not subject to a duty to keep the content of the dollar constant during the period intervening between promise and performance. The erroneous assumption of the existence of such a duty vitiates any argument in favor of the petitioners as to an anticipatory breach just as it vitiates their argument as to the implications of the call. The duty of the Government and its only one was to pay the bonds when due. If the statutes had been amended before the date of redemption or if the courts had decided that payment must be made in gold or in currency proportioned to the earlier content of the dollar, there is little likelihood that any one would judge the efficacy of the notice by the test of the law in force at the date of its announcement.

The petitioners being dislodged from the position that the notices of call were void in their inception are perforce driven to the stand that they became nullities thereafter, when the statutes were unrepealed at the designated date. But at the designated date the accelerated maturity was already an accomplished fact. The duty of payment did not arise in advance of maturity. In the very nature of things it presupposes maturity as a preliminary condition. If there had been any different intention, the bonds would have provided that interest should cease upon payment or lawful tender, and not from the date of redemption stated in the call. This is not a case of mutual promises or covenants with performance to be rendered on each side at a given time and place. The obligees were not under a duty to do anything at all at the accelerated maturity, though they were privileged, if they pleased, to present the bonds for payment. Most of the learning as to dependent and independent promises in the law of bilateral contracts (*Loud* v. *Pomona Land & W. Co.*, 153 U. S. 564, 576) is thus beside the mark. This is a case of a unilateral contract where

the only act of performance, the payment of the bonds, was one owing from the obligor, and arose by hypothesis upon maturity and not before. Let maturity, whether normal or accelerated, be accepted as a postulate, and it must follow that default in payment will not change the date again. If the Government were to come forward with a tender a day or a week after the designated date, the obligees would not be sustained in a rejection of the payment on the theory that the original date of maturity had been restored by the delay. If the obligees were to sue after the designated date, the Government would not be heard to say that because of the default in payment, the proposed acceleration was imperfect and inchoate. As pointed out already, the bondholders became entitled, when once the notice had been published, to a measure and medium of payment sufficient to discharge the debts. If the then existing Acts of Congress were valid altogether, payment would be sufficient if made in the then prevailing currency. If the Acts were invalid, either wholly or in some degree, there might be need of something more, how much being dependent upon the operation of an implied obligation, read into the bonds by a process of construction, to render an equivalent. Whatever the form and measure, the bondholders had a remedy if they had chosen to invoke it.

We do not now determine the effect of a notice given in bad faith with a preconceived intention to withhold performance later. Fraud vitiates nearly every form of conduct affected by its taint, but fraud has not been proved and indeed has not been charged. There is no reason to doubt that a Secretary of the Treasury who was willing to give notice of redemption after knowledge of the decision in *Perry* v. *United States* understood that the obligation of the Government would be measured by the Constitution and not by any statute, in so far as the two might be found to be in conflict. Never for a moment

was there less than complete submission to the supremacy of law. At the utmost, there was honest mistake as to rights and liabilities in a situation without precedent. Fraud being eliminated, the case acquires a new clarity. When we reach the heart of the matter, putting confusing verbiage aside and fixing our gaze upon essentials, the obligation of the bonds can be expressed in a simplifying paraphrase. "This bond shall be payable on June 15, 1947, or (upon three months notice by the Secretary of the Treasury) on June 15, 1932, or any interest date thereafter." That is what was meant. That in substance is what was said.[3]

No question of constitutional law is involved in the decision of these cases. No question is here as to the correctness of the decision in *Perry* v. *United States*, or as to the meaning or effect of the opinion there announced. All such inquiries are put aside as unnecessary to the solution of the problem now before us. Irrespective of the validity or invalidity of the whole or any part of the legislation of recent years devaluing the dollar, the maturity of the bonds in suit was accelerated by valid notice. As a consequence of such acceleration the right to interest has gone.

*Second.* The Secretary of the Treasury did not act in excess of his lawful powers by issuing the calls without further authority from the Congress than was conferred by the statutes under which the bonds were issued.

---

[3] Important differences exist, and are not to be ignored, between the retirement of shares of stock (*Sterling* v. *H. F. Watson Co., supra; Corbett* v. *McClintic-Marshall Corp.*, 17 Del. Ch. 165; 151 Atl. 218), and the accelerated payment of money obligations, and also between the acceleration of the obligations of the Government and those of other obligors. In the case of private obligations, a liability for interest survives the acceleration of the debt and continues until payment. In the case of Government obligations, interest does not continue after maturity (in the absence of statute or agreement) though payment is not made.

The argument to the contrary is inconsistent with the plain provisions of the statutes and also of the bonds themselves.

There was also confirmation of his power in subsequent enactments. Victory Liberty Loan Act, § 6, 40 Stat. 1311, as amended, March 2, 1923, c. 179, 42 Stat. 1427, and January 30, 1934, § 14 (b), 48 Stat. 344; Gold Reserve Act of 1934, § 14, 48 Stat. 343; Act of February 4, 1935, §§ 2, 4, 49 Stat. 20.

*Third.* In issuing the calls, the Secretary of the Treasury was not limited by the Act of March 18, 1869 (R. S. 3693; 16 Stat. 1) which in its day placed restrictions upon the redemption by the Government of interest-bearing bonds.

The aim of that statute was the protection of holders of United States obligations not bearing interest, the "greenbacks" of that era. "The bonds of the United States are not to be paid before maturity, while the note-holders are to be kept without their redemption, unless the note-holders are able at the same time to convert their notes into coin." Statement of Robert C. Schenck, one of the House Managers, Congressional Globe, March 3, 1869, p. 1879. Upon the resumption of specie payments in 1879 the aim of the statute was achieved, and its restrictions are no longer binding.

The judgments in Nos. 42 and 43 should be affirmed, and that in No. 198 reversed.

> *Nos. 42 and 43, affirmed.*
> *No. 198, reversed.*

Dissenting: MR. JUSTICE MCREYNOLDS, MR. JUSTICE SUTHERLAND and MR. JUSTICE BUTLER. See *post*, p. 364.

MR. JUSTICE STONE.

I concur in the result.

I think the court below, in the *Machen* case, 87 F. (2d) 594, correctly interpreted the bonds involved in

these cases as reserving to the government the privilege of accelerating their maturity by paying them or standing ready to pay them on any interest date according to their tenor, and upon giving the specified notice fixing the "date of redemption." The words "redeemed" and "redemption" as used in the bonds[1] point the way in which the privilege was to be exercised as plainly as when they are written in the bonds of a private lender. *Lynch* v. *United States,* 292 U. S. 571, 579; cf. *Perry* v. *United States,* 294 U. S. 330, 352. If payment, or readiness to pay the bonds in accordance with their terms was essential to "redemption," the one or the other, equally with the required notice, was a condition of acceleration.

The obligation of the bonds, read in the light of long established custom and of our own decision in *Holyoke Water Power Co.* v. *American Writing Paper Co.,* 300 U. S. 324, 336, decided since the *Perry* case, must, I think, be taken to be a "gold value" undertaking to pay in gold dollars of the specified weight and fineness or their equivalent in lawful currency. Compare *Norman* v. *B. & O. R. Co.,* 294 U. S. 240, 302. *Feist* v. *Société Intercommunale Belge, &c.,* L. R. [1934] A. C. 172, 173. The suppression of the use of gold as money, and the restriction on its export and of its use in international exchange, by acts

---

[1] The redemption clause is as follows:

"The principal and interest of this bond shall be payable in United States gold coin of the present standard of value, . . . All or any of the bonds of the series of which this is one may be redeemed and paid at the pleasure of the United States on or after June 15, 1932, or on any semi-annual interest payment date or dates, at the face value thereof and interest accrued at the date of redemption, on notice published at least three months prior to the redemption date, and published thereafter from time to time during said three months period as the Secretary of the Treasury shall direct. . . . From the date of redemption designated in any such notice interest on the bonds called for redemption shall cease, and all coupons thereon maturing after said date shall be void. . . ."

of Congress, 48 Stat. 1, 337, did not relieve the government of its obligation to pay the stipulated gold value of the bonds in lawful currency. Hence it has not complied, or ever stood ready to comply, with one of the two conditions upon performance of which the bonds "may be redeemed and paid" in advance of their due date—the payment to the bondholder of the currency equivalent of the stipulated gold value.

It will not do to say that performance of this condition can be avoided or dispensed with by the adoption of any form of words in the notice. Nor can it be said that a declaration, in the notice, of intention to pay whatever can be collected in court, see the *Perry* case, *supra*, 354, is equivalent to a notice of readiness to pay the currency equivalent of the gold value stipulated to be paid, or that a statement of purpose to pay what will constitutionally satisfy the debt suffices to accelerate although no payment of the currency equivalent is made or contemplated or is permitted by the statutes. It follows that judgment must go for the bondholders unless the Joint Resolution of Congress of June 5, 1933, 48 Stat. 112, requiring the discharge of all gold obligations "dollar for dollar" in lawful currency, and declaring void as against public policy all provisions of such obligations calling for gold payments, is to be pronounced constitutional.

Decision of the constitutional question being in my opinion now unavoidable, I am moved to state shortly my reasons for the view that government bonds do not stand on any different footing from those of private individuals and that the Joint Resolution in the one case, as in the other, was a constitutional exercise of the power to regulate the value of money. Compare *Norman* v. *B. & O. R. Co., supra,* 304, 309. Without elaborating the point, it is enough for present purposes to say that the undertaking of the United States to pay its obligations in gold, if binding, operates to thwart the exercise of the

constitutional power in the same manner and to the same degree *pro tanto* as do bonds issued by private individuals, *Norman* v. *B. & O. R. Co., supra,* 311 *et seq.,* except insofar as the government resorts to its sovereign immunity from suit. Had the undertaking been given any force in the *Gold Clause Cases,* or the meaning which we have since attributed to it when used in private contracts, it would, if valid and but for the immunity from suit, have defeated the government policy of suspension of gold payments and devaluation of the dollar. Compare the *Norman* case, *supra,* with the concurring memorandum in *Perry* v. *United States, supra,* 360–361.

The very fact of the existence of such immunity, which admits of the creation of only such government obligations as are enforceable at the will of the sovereign, is persuasive that the power to borrow money "on the credit" of the United States cannot be taken to be a limitation of the power to regulate the value of money. Looking to the purposes for which that power is conferred upon the national government, its exercise, if justified at all, is as essential in the case of bonds of the national government as it is in the case of bonds of states, municipalities and private individuals. See *Norman* v. *B. & O. R. Co., supra,* 313 *et seq.* Its effect on the bondholders is the same in every case. Compare *Norman* v. *B. & O. R. Co., supra,* with *Nortz* v. *United States,* 294 U. S. 317. No reason of public policy or principle of construction of the instrument itself has ever been suggested, so far as I am aware, which would explain why the power to regulate the currency, which is not restricted by the Fifth Amendment in the case of any obligation, is controlled, in the case of government bonds, by the borrowing clause which imposes no obligation which the government is not free to discard at any time through its immunity from suit. I cannot say that the borrowing clause which is without force to compel the sovereign to

pay nevertheless renders the government powerless to exercise the specifically granted authority to regulate the value of money with which payment is to be made.

MR. JUSTICE BLACK, concurring.

Agreeing altogether with the opinion of MR. JUSTICE CARDOZO, which deals only with the construction of the contract and the rights flowing from the notice, I find it unnecessary and therefore inappropriate to express any opinion as to the validity of the Joint Resolution of 1933 or other acts of legislation devaluing the dollar.

MR. JUSTICE McREYNOLDS, dissenting.*

MR. JUSTICE SUTHERLAND, MR. JUSTICE BUTLER and I cannot acquiesce in the conclusion approved by the majority of the Court. In our view it gives effect to an act of bad faith and upholds patent repudiation. Its wrongfulness is betokened by the circumlocution presented in defense.

The suit is to recover in currency of today the face value of a past due coupon originally attached to a three and one-half per cent bond of the United States issued in 1917 and payable 1947—nothing else.

The opinion of the Circuit Court of Appeals, to which little can be added, sets out the important facts and adequately supports its judgment.

In 1917, when gold coins contained 25.8 grains to the dollar, the United States obtained needed funds by selling coupon bonds—among them the one here involved. They solemnly agreed to pay the holder one thousand dollars on June 15, 1947, with semi-annual interest, in "gold coin of the present standard of value" subject to the following option:—"All or any of the bonds of the

---

* This opinion was entitled in only one of the three cases, No. 198.

series of which this is one may be redeemed [1] and paid at the pleasure of the United States on or after June 15, 1932, on any semi-annual interest payment date or dates, at the face value thereof and interest accrued at the date of redemption, on notice published at least three months prior to the redemption date. . . . From the date of redemption designated in any such notice, interest on the bonds called for redemption shall cease, and all coupons thereon maturing after such date shall be void."

The promise is to pay one thousand dollars in gold coin, 1917 standard. The face value of the bond is one thousand gold dollars. The option reserved is to redeem and pay after notice by giving the holder that number of such dollars. The notice required is nothing less than a declaration of *bona fide* purpose to redeem or pay off the obligation as written—no other right was reserved. A notice divorced from that purpose could amount to nothing more than a dishonest effort to defeat the contract and defraud the creditor. It would not come within the fair intendment of the contract; would not, in truth, designate a "date of redemption"; and, therefore, could not hasten the maturity of the principal or cause interest to cease. All this seems obvious, if respect is to be accorded to the ordinary rules of construction and principles of law governing contracts.

The obligation of the bond was declared by this Court in *Perry* v. *United States,* 294 U. S. 330, 351, 353, 354, to be a pledge of the credit of the United States and an assurance of payment as stipulated which Congress had no power to withdraw or ignore. "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudia-

---

[1] Redeem—5. To buy off, take up or remove the obligation of, by payment or rendering of some consideration; as to redeem bank notes with coin.

Webster's New International Dictionary.

tion, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." "The power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers" was there denied. "The binding quality of the promise of the United States is of the essence of the credit which is so pledged. Having this power to authorize the issue of definite obligations for the payment of money borrowed, the Congress has not been vested with authority to alter or destroy those obligations. The fact that the United States may not be sued without its consent is a matter of procedure which does not affect the legal and binding character of its contracts. While the Congress is under no duty to provide remedies through the courts, the contractual obligation still exists and, despite infirmities of procedure, remains binding upon the conscience of the sovereign."

The right to redeem and pay the bond at face value after notice was reserved—nothing else. Did the United States give notice of a *bona fide* purpose so to redeem and pay? If not they cannot properly claim to have exercised their option to mature the obligation. That they did not honestly comply with this necessary preliminary becomes obvious upon consideration of the circumstances and pertinent legislation.

There is no question here concerning the Government committing itself through notice sent out by the Secretary of the Treasury expressly or indirectly to a forbidden medium of payment. No question of an anticipatory breach of contract. The Government simply has not in good faith complied with a condition precedent. It has never given notice of purpose to pay the obligation according to its terms. Its suggestion was to make payment of another kind.

The Circuit Court of Appeals well said—

"The notice calling the bond for payment was in the usual form; and there is no question but that it would have had the effect of stopping the running of interest and avoiding the coupons maturing after June 15, 1935, except for the legislation of Congress affecting the currency, which limited the power of the Secretary of the Treasury and must be read into the notice. At the time of the issuance of the bond the gold dollar was the standard of value in our monetary system and was defined by law as consisting of twenty-five and eight tenths grains of gold nine-tenths fine. Act of Mar. 14, 1900, c. 41, sec. 1, 31 Stat. 45, 31 U. S. C. A. 314. And the statutes provided for the use of gold coin as a medium of exchange. R. S. 3511. By Presidential Proclamation of January 31, 1934, issued under the act of May 12, 1933 (38 Stat. 52, 53), as amended by the act of January 30, 1934 (48 Stat. 342), the content of the dollar was reduced to 15-5/21 grains of gold nine-tenths fine; and, at the time of the publication of the notice calling the bond for payment, gold coin had been withdrawn from circulation, its possession had been prohibited under penalty, and payment in gold coin by the United States had been prohibited. 48 Stat. 337, 340. By joint resolution of June 5, 1933 (48 Stat. 112, 113), the payment of gold clause bonds in any legal tender currency 'dollar for dollar' had been authorized; and it was paper currency based on the 15-5/21 grain dollar, and nothing else, that was offered in payment of gold clause bonds which were called for payment by the Treasury. The notice of redemption calling the bond in question for payment was equivalent, therefore, to a notice that the United States elected to redeem the bond in paper currency based on a 15-5/21 grain dollar, notwithstanding that it was payable in gold coin based on a 25-8/10 grain dollar and might be redeemed only at its face value. . . .

"It is manifest that when the bonds were payable in gold coin of the standard of value at the time of issue,

i. e., 25-8/10 grains of gold to the dollar, a proposal to redeem them in paper money based upon 15-5/21 grains of gold to the dollar was not a proposal to redeem them at face value; and a notice that the government would redeem them on such basis, which is what the notice in question means when considered as it must be in connection with the legislation binding upon the Secretary of the Treasury, was not such a notice as the bonds prescribed for the exercise of the option retained by the government."

We are not now concerned with the power of the United States to discharge obligations at maturity in depreciated currency or clipped coin. Did they cause respondent's bond to mature before the ultimate due date by proper exercise of the option reserved when they sent out a notice which in effect stated that payment would not be made as provided by the bond, but otherwise? The answer ought not to be difficult where men anxiously uphold the doctrine that a contractual obligation "remains binding upon the conscience of the sovereign" and reverently fix their gaze on the Eighth Commandment.

We concur in the views tersely expressed in the following paragraph excerpted from the opinion below—

"No amount of argument can obscure the real situation. It is this: the government has promised to pay the bonds in question in gold coin of the standard of value prevailing in 1917. By their terms, it is permitted to redeem them only by paying them at their face value. It is proposing to redeem them, not by paying them at that face value but in paper money worth only about 59% thereof. The notice which it has issued means this and nothing else. Such a notice is not in accordance with the condition of redemption specified in the bond and consequently does not stop the running of interest or avoid the coupons."

The challenged judgment was correct and should be affirmed.