PHOENIX FINANCE CORPORATION *v.* IOWA-WISCONSIN BRIDGE COMPANY, a Delaware corporation.

(*November 27, 1940.*)

RODNEY and SPEAKMAN, J. J., sitting.

*James R. Morford* (of Marvel and Morford) for plaintiff.

*Daniel F. Wolcott* (of Southerland, Berl, Potter and Leahy) and *Fred A. Ontjes* (of Mason City, Iowa) for defendant.

Superior Court for New Castle County, No. 159, September Term, 1939.

RODNEY, J., delivering the opinion of the court:

The determination of the present question involves considerations of both law and fact. The defendant admits that the sale of toll tickets took place in 1931, and contends that the plaintiff or its predecessor was immediately thereafter entitled to the performance of the contract. The defendant contends that a party purchasing toll tickets cannot prevent the running of the statute of limitations as to such tickets, by delay in presenting them, or by a postponement of the demand of performance of the contract after he is entitled to such performance. From this viewpoint we shall commence our discussion.

The precise subject of this litigation is a mass of bridge toll tickets having a face value of $5,000. The tickets themselves, as admitted in evidence, contain no details of the nature of the contract between the parties. The nature of transportation tickets issued by a common carrier

to a prospective traveler has been the subject of divergent judicial views. We know of no reason why the ticket itself may not embrace the entire agreement between the parties, and thus constitute the exclusive contract between them. Where, however, the ticket contains no terms of agreement, we think it constitutes a token, receipt or voucher showing the payment of the fare, and that pursuant to the contract then made the holder of the ticket is entitled to the passage. 10 *Am. Jur.* 134; 13 *C. J. S., Carriers,* § 603, 1158; 1 *Harvard L. Rev.* 17; 25 *Mich. L. Rev.* 14.

A bridge toll ticket having been purchased and being in the possession of the purchaser, the use of it lies within his discretion within certain limits. The passage represented by the ticket is to be accorded the purchaser upon his demand. This demand, under ordinary circumstances, we think, must be made within a reasonable time and, in the absence of other controlling stipulations, we think the term "reasonable time" is measured by the period of the applicable statute of limitations. This period of the statute of limitations has been adopted as the reasonable time within which the somewhat analogous example of a railroad ticket should be used. *Freeman v. Atchison, etc., R. Co.,* 71 *Kan.* 327, 80 *P.* 392, 6 *Ann. Cas.* 118; *Cassiano v. Galveston, H. & S. A. Ry. Co., Tex. Civ. App.,* 82 *S. W.* 806; 2 *Michie on Carriers, p.* 1622; 5 *Elliott on Railroads,* 3d *Ed., Sec.* 2422; *Hutchison on Carriers, Sec.* 1043.

It is, however, a noteworthy fact that in most of the cases requiring the presentation of the tickets within the period of the statute of limitations the courts have considered the case of an individual or single ticket. As said in *Cassiano v. Galveston, H. & S. A. Ry. Co., supra* [82 *S. W.* 807]:

"No one buys railroad tickets to store away and be kept to be transmitted as part of his estate to his heirs, but they are bought

for immediate use; and such use of them must necessarily be in contemplation of the parties when the ticket is sold."

This implication of immediate and individual use of a ticket, however, must lose somewhat of its force when we consider not a single ticket but a gross or bulk sale of $5,000 worth of tickets represented by 1,000 booklets having a value of $5 each. When no reasonable and personal use of the tickets could possibly have exhausted them within the period of the statute of limitations, but the expiration of that period would have left a large part unused, the law will not indulge in any binding presumption that such personal or individual use was the intendment of the parties.

There are, too, some very material and apparent differences between ordinary railroad tickets and the toll tickets involved in the present case. The ordinary railroad ticket customarily bears thereon the date of its issuance, so that some definite time is established as the commencement of that reasonable time within which it should be used. The tickets involved in the present case merely read:

Black Hawk Bridge
Crossing Mississippi
Lansing-Iowa DeSoto, Wis.
50¢ [varying amount]
Iowa-Wisconsin Bridge Co.

In the absence of express limitation a transportation ticket is assignable and passes from one person to another by delivery, without affecting its validity. Where no date of purchase appears on the ticket any holder subsequent to the original purchaser would have no notice of the date of purchase or of the time within which the ticket must be presented. The ticket involved in the present case, undated and devoid of contractual terms, is somewhat analogous to the ordinary metal trolley token which en-

titles the holder to transportation upon demand, and we should rather expect to look from the present ticket to some other source as indicative of the real contract between the parties.

■ The ticket being the visible and tangible token indicative of the contract between the parties is not, of itself, such an instrument as would exclude parol evidence of the real contract. 10 *Am. Jur. p.* 137, and see cases collected in note in 62 *A. L. R.* 655.

■ We have heretofore stated that, under ordinary circumstances, demand for transportation represented by a ticket must be made within a reasonable time, and this reasonable time is measured by the period of the applicable statute of limitations, from the date of the purchase. We think, however, that where the parties have stipulated or clearly contemplated a delay in making a demand to some time in the future, definite or indefinite, that then the statutory time for bringing the action is not necessarily measured from the initial transaction, but from the later date upon which the demand was stipulated or contemplated, according to the terms of the particular contract. The necessity for a more speedy demand manifestly in violation of the contract could not be assumed. *Jameson v. Jameson,* 72 *Mo.* 640.

See, also, *Fallon v. Fallon,* 110 *Minn.* 213, 124 *N. W.* 994, 32 *L. R. A.* (*N. S.*) 486, 136 *Am. St. Rep.* 464; *Massie v. Byrd,* 87 *Ala.* 672, 6 *So.* 145; *Andrews v. Andrews,* 170 *Minn.* 175, 212 *N. W.* 408, at 411, 213 *N. W.* 899, 51 *A. L. R.* 542.

A demand delayed by the inducement or specific agreement of the opposite party has been excused. *Lydig v. Branman,* 177 *Mass.* 212, 58 *N. E.* 696; *Emmons v. Hayward,* 6 *Cush.* (*Mass.*) 501; *Roberts v. Berdell,* 52 *N. Y.* 644.

The plaintiff has introduced evidence tending to sustain its contentions as set out in the statement of facts. The defendant has introduced no evidence whatever.

From the evidence, then, we find as facts that the sale of tickets was made to Thompson and Company in 1931, with the understanding and agreement that the tickets would remain with the Bridge Company to be sold by it for the account of Thompson and Company when circumstances would permit, so as not to unduly interfere with the reasonable cash receipts of the Bridge Company; that tickets did so remain with the Bridge Company until 1934; that in 1933 Oscar Thorson, the general manager of the Bridge Company who made the original sale of the tickets and agreement as to their disposition, was appointed by the federal court in Iowa as operating receiver of the Bridge Company. It is also in evidence that several times each year conversations were had between representatives of the plaintiff and Thorson concerning the disposition of the tickets, and that these conversations took place both before and after his appointment as operating receiver, and that after such appointment he agreed "to move the tickets as soon as it could be done without jeopardizing the interests of the Company." There is also testimony that the conditions attached to the sale of the tickets to Thompson and Company were duly reported to and discussed by the Board of Directors of the Bridge Company.

Under these circumstances it is incumbent upon us to determine:

(1) Whether Oscar Thorson, as general manager of the Bridge Company, had authority to make the contract of sale of the tickets under the terms and conditions as contended by the plaintiff and in evidence in this suit or, if not, whether his action was had with the knowledge and approval of the Board of Directors.

(2) What effect the appointment of Thorson as receiver of the Bridge Company had upon the operation of the statute of limitations and the consequent time in which suit need be brought.

1. At the time of the sale of the tickets to Thompson and Company, Oscar Thorson was secretary, treasurer and general manager of the Bridge Company. Concededly he had authority to sell bridge toll tickets, and we think it must be admitted that he could sell tickets in small bulk or lots, as the tickets were arranged in booklets of a value of $5. The resolution authorizing Thorson to act as general manager provides:

"Resolved that Oscar R. Thorson be and he is hereby appointed, instructed and authorized to act as general manager of the Black Hawk Bridge and all things pertaining thereto, subject to the orders of the Board of Directors, to use his best judgment in the purchasing of necessary materials, look after the interest of the corporation and to operate the Black Hawk Bridge for profit."

The president of the Bridge Company was in that vicinity on the average of but two days in each month, and Mr. Thorson otherwise had full charge of the operation of the bridge. His express authority by resolution is quite broad. In the matter of incurring expense by purchase of materials he has only to "use his best judgment." He was expressly authorized to "look after the interest of the Corporation" and to operate the bridge for profit. It would appear that the sale as made by Thorson was made in the interest of the company. The tickets were not sold at a discount, but the Bridge Company received and retained the full value for them. We think the broad powers given the general manager by resolution are substantially tantamount and coextensive to those powers which inhere to the office of general manager where there is no express authority. A general manager, is as the term indicates, a manager for all the general purposes of the corporation, and has implied authority to do anything that the corporation

could do in the general scope and operation of its business. While we think there was both express and implied power in the general manager to make the contract in question, yet we need not stop there. There is evidence that the sale of the tickets by Thorson, and the nature of the contract, was reported to the Board of Directors and discussed by such board. There is no evidence by the defendant denying that the directors knew of the sale and contract and had discussed the matter, but it is objected that the corporate minutes do not disclose such discussion. We think that corporate minutes are prima facie evidence of the proceedings which transpired at the meeting, but that competent testimony is admissible in supplementing such minutes where a matter has been omitted. 18 *C. J. S., Corporations,* §§ 191, 612; *Ko Eune v. State Bank of Schuylkill Haven,* 134 *Pa. Super.* 108, 4 *A.* 2*d* 234; *Fletcher on Corporations, Permanent Ed., Sec.* 4659.

We think the sale of tickets as made by the general manager and discussed by the Board of Directors, and not disavowed by them, was binding on the corporation when the corporation retained and used the full consideration of the tickets.

2. On September 26, 1933, Oscar R. Thorson was appointed as operating receiver of the Bridge Company under mortgage foreclosure proceedings. In the decree the receiver was given six months from its date

"* * * within which to elect, with approval of this Court, to adopt or continue in force, or refuse to adopt or continue in force, any lease, arrangement, or contract not fully performed, which may be included in the property of which he is appointed Receiver; such election may be made from time to time and shall be made by written instrument subscribed by said Receiver, approved by the Court, and filed in the office of the Clerk of this Court, and no conduct or user of rights by said Receiver, or payments made by said Receiver, or any other acts or omissions of said Receiver within said period, unaccompanied by the filing of such written instrument, shall be deemed to conclude said Receiver in respect of such election, or be

deemed to constitute and election to adopt or continue in force any such contract, lease, or agreement."

Mr. Thorson took no action as to the tickets under the quoted portion of the decree either by electing to continue the contract in force or by refusing to adopt it, and it is quite unnecessary in this case for us to consider the question as to whether the failure to exercise the election had only to do with some claim by or against the receiver.

It is in evidence that Mr. Thorson from three to six times each year re-affirmed his knowledge of the contract and of his intention to dispose of the tickets when compatible with the interests of the Bridge Company. It is objected that such statements of Thorson after his appointment as receiver can not be considered as binding on the Bridge Company, and a motion to strike such testimony was made. It is in evidence that the statement of Thorson reaffirming the contract continued until June, 1937. On August 7, 1937, Mr. Thorson, as receiver of the Bridge Company, for the first time informed the plaintiff that the tickets would not be honored. No other person, so far as the evidence shows, ever made any representation to the plaintiff concerning the validity of the tickets.

We think the evidence of Mr. Thorson having charge of the operation of the bridge can not be stricken from the record.

 The original contract, as we understand it, covered the sale of some 20,000 tickets, bound in 1,000 booklets, each booklet having a value of $5, making the total payment by Thompson and Company to the Bridge Company of $5,000. The contract provided that after the money was received by the Bridge Company the tickets would be sold from time to time by the Bridge Company, for the benefit or account of the plaintiff or of its predecessor. We think the statute of limitations would not be-

gin to run until some disavowal of the contract on the part of the defendant, or of some repudiation or dishonoring of the tickets by the defendant or someone in authority. From his appointment as operating receiver in 1933, Thorson alone could determine whether the tickets would be honored. With his approval the plaintiff could have used the tickets or, as suggested, sell the tickets "independently" to third persons, and thus be recompensed for its original outlay. Until Thorson gave notice on August 7, 1937, that the tickets would not be honored, no notice of any kind had been given to the plaintiff either by the defendant or by the receiver that the original contract was repudiated or the tickets dishonored. Thorson, the person who had the sole authority of honoring or dishonoring the tickets, and who did dishonor them on August 7, 1937, did, a short time earlier, agree "to move the tickets as soon as it could be done without jeopardizing the interests of the Company." Even though Thorson was the operating receiver of the Bridge Company, we think his testimony has materiality as affecting the rights of the plaintiff and the time of exercising these rights.

In view of our conclusion, it is unnecessary to further consider the effect on the statute of limitations of the appointment of Thorson as operating receiver of the defendant by the court in Iowa, in connection with the foreclosure of the corporate mortgage, or of the fact that for a short period the charter of the defendant was affected by the non-payment of franchise taxes.

Judgment will be entered in favor of the plaintiff and against the defendant.