CUMANA INVESTMENTS S.A.,
Plaintiff,

v.

FLUOR CORPORATION, Defendant.

Civ. A. No. 84–37–JLL.

United States District Court,
D. Delaware.

Aug. 31, 1984.

Allen M. Terrell, Jr. and William J. Wade of Richards, Layton & Finger, Wilmington, Del., Richard A. Frank, Donald H. Green, Sydney J. Kase, and Jeffrey W. Carr of Wald, Harkrader & Ross, Washington, D.C., of counsel, for plaintiff.

A. Gilchrist Sparks, III and Eric C. Howard of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Herbert M. Wachtell, Lawrence B. Pedowitz, Barbara Robbins, Richard H. Weiss of Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for defendant.

## OPINION

LATCHUM, Senior District Judge.

This is an action by Cumana Investments S.A. ("Cumana") for recovery on the claims

of two Iranian nationals against an international joint venture. Cumana seeks damages for breach of an alleged contract or, alternatively, recovery to prevent the defendant's unjust enrichment. (Docket Item ["D.I."] 1.) Cumana further asks the Court to require the defendant, Fluor Corporation ("Fluor"), to make future payments which may come due under the supposed contract. (*Id.*) The case is before the Court on Fluor's motion for summary judgment.[1] After reviewing the arguments of counsel and pertinent legal authority, the Court concludes, for the reasons set forth in this opinion, that Fluor is entitled to summary judgment.

FACTUAL BACKGROUND

The dispositive facts in the case are not in dispute. On October 8, 1973, the corporation now known as Thyssen Rheinstahl Technik GmbH ("Thyssen"), a subsidiary of the West German corporation Thyssen AG, executed a "memo of understanding" ("memo") with Mr. Abolfath Mahvi and Mr. Manuchehr Riahi (D.I. 9 at 4), citizens of Iran who acted as consultants to enterprises seeking to do business in Iran. (D.I. 13 at appendix 1, pp. 2–5.) According to the memo, Messrs. Mahvi and Riahi were "interested to act [sic] as Consultants to Thyssen only" (D.I. 10, Exhibit B at K–13), in Thyssen's efforts to obtain from the National Iranian Oil Company ("NIOC") the award of contracts for the construction of a proposed export refinery and a gas pipeline. (*Id.*) The compensation arrangement in the memo provided that "Thyssen accepts in case of contract-award to reserve a reasonable percentage payable over the period extending from award to finalization of such contract(s). Details of such compensation to be agreed upon ...." [2] (*Id.*) The memo is signed by Messrs. Mahvi and Riahi and by a Dr. H. Gschwend on behalf

of Thyssen. At the top of the page, above the heading "Memo of Understanding," is typed an addendum which states, "This Memo of Understanding also covers NIOC Refinery Project [E]sfahan as well as Tehran III, and it is envisaged to enter [sic] similar arrangements of co-operation for other future NIOC Projects." (*Id.*) The addendum is dated November 7th, 1974 and is signed by Dr. Gschwend. (*Id.*)

It is this addendum that has pulled Fluor into the fray. In mid-1975, a subsidiary of Fluor, Fluor Atlantic Ltd., associated with Thyssen in a joint venture ("Esfahan Venture") to contract with NIOC for the construction of an oil refinery near Esfahan, Iran. (D.I. 10 at 2.) The plaintiff reasons that the memo addendum adding Esfahan to the projects purportedly covered by the memo brings Fluor under the obligations of the memo. (D.I. 1 at ¶¶ 7–9.) It is a sort of "contracting twice removed" idea: "A" contracts with "B", which is in a joint venture with "C", which is owned by "D", therefore "D" has contracted with "A".

The Esfahan Venture succeeded in obtaining the contract with NIOC and began receiving substantial down-payments under it in August of 1975. (D.I. 27 at 5.) As construction progressed, hundreds of millions of dollars in additional payments were received. (*Id.*) At no time, however, did the Esfahan Venture make any payments to Messrs. Mahvi and Riahi. By the plaintiff's own account, Messrs. Mahvi and Riahi, "at times when they believed Joint Venture payments might have been made by NIOC to Thyssen, thus triggering their right to receive payments, ... asked Thyssen for accountings and for their payments." (D.I. 13 at 10.) They received neither. (*Id.* at 10–11.) On January 26, 1978, Dr. Gschwend, the Thyssen official who signed the memo, wrote to Messrs.

---

1. Fluor had styled its motion as one to dismiss (D.I. 8), but the parties now acknowledge that because affidavits and other evidence beyond the pleadings have been submitted for consideration by the Court, the motion is properly one for summary judgment. (D.I. 13 at 2; D.I. 27 at 3.) *See* Fed.R.Civ.P. 12(b).

2. Cumana's complaint alleges that in November of 1974 the parties orally agreed that the amount of compensation was to be 4% of all gross amounts received if the contract or contracts were awarded after a limited tender and bidding, and 5% of all gross revenue if the contract or contracts were awarded directly to Thyssen. (D.I. 1 at ¶ 9.)

Mahvi and Riahi stating, "I do not believe that with regard to the [E]sfahan Refinery Project we are under any obligation whatsoever to you. I would therefore suggest that correspondence on this subject be discontinued. Should you feel ... otherwise, legal courses are open to you." (D.I. 10, Exhibit B at K–19.)

Over three years elapsed before the legal action Dr. Gschwend invited came to pass. In July of 1981 Cumana brought suit against Thyssen in the Federal Republic of Germany on essentially the same claims as are asserted in this Court; Fluor was not a party in those proceedings. The West German court ruled in a carefully reasoned 1982 opinion that, applying Iranian law (D.I. 10, Exhibit D at 11–12), the memo was not a binding contract nor was a contract ever otherwise created between the parties (*id.* at 14–18), that under German law the memo would be void and unenforceable even if it were a contract because it was premised on Mr. Mahvi's abusing his position of trust in the Persian court and was thus against public policy (*id.* at 18–19), and that the plaintiff's claims would be barred by the German equivalent of laches (*id.* at 19–21).

■ Notwithstanding that resounding rejection of its claims, Cumana seeks to recover on them in this suit filed in 1984 against Fluor. There are numerous obstacles blocking success for Cumana: questions of the *res judicata* effect of the West German decision, the doubtful merits of the claims themselves, and the equally doubtful enforceability of the claims, both because Fluor has only a tenuous connection to the memo of understanding and because the memo, in the context made, smacks of improbity.[3] The Court need not address these questions, however, because Cumana's claims are in any event time-barred and Fluor is entitled to summary judgment on that basis alone.

## STATUTE OF LIMITATIONS

■ What jurisdiction's statute of limitations is controlling in this case is a question of Delaware law. *Klaxon Co. v. Stentor Elec. Manufac. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The parties agree (D.I. 13 at 15; D.I. 9 at 9–10) that under Delaware law a three-year statute of limitations should be applied. 10 *Del.C.* §§ 8106, 8121. The threshold question, then, is at what point did the cause of action accrue and the three-year period begin to run. This too is a question of Delaware law.[4]

3. Even if Cumana's claims were meritorious and Fluor were somehow liable for the actions of its subsidiary's joint venture partner, the Court doubts that Cumana could enforce its claims because, as the West German court noted, it appears the underlying contract would be found *contra bonos mores.* (D.I. 10, Exhibit D at 18–19.) It is fundamental that if the consideration for an agreement includes something opposed to public policy, the agreement is void. *Kelly v. Bell,* Del.Ch., 254 A.2d 62, 69 (1969), *aff'd,* Del.S.Ct., 266 A.2d 878 (1970). Although not yet apprised of all the evidence in this case, the Court nevertheless suspects that the "services" Messrs. Mahvi and Riahi claim to have rendered and for which they seek remuneration are of a type forbidden by law. The legal encyclopedia which the plaintiff has urged on the Court as authoritative (D.I. 13 at 21, 24, 26, 31; D.I. 27 at 45), includes this telling commentary:

A people can have no higher public interest, except the preservation of their liberties, than integrity in the administration of their government in all its departments. It is, therefore, a principle of the common law that

it will not lend its aid to enforce a contract to do an act which tends to corrupt or contaminate ... the integrity of ... social or political institutions. Public officers should act from high consideration of public duty, and hence every agreement whose tendency or object is to sully the purity or mislead the judgments of those to whom the high trust is confided is condemned by the courts.

So services performed, influence exerted, or remuneration received, to induce those engaged in public service to do something for gain or detrimental to the public service, render the contract void; and contracts are illegal and void which promote the use of personal influence or extraneous pressure on the conduct of public officials, whether of this country or of a foreign country.

17 C.J.S. Contracts § 212 (footnotes omitted).

4. Although not entirely clear, the plaintiff's brief seems to argue that Iranian law could be governing on this point. (D.I. 13 at 15–16.) But because plaintiff asserts, and defendant does not contend otherwise, that "under both Iranian and Delaware law, the statutory period [of limi-

The plaintiff admits that, between 1975 and 1979, Mr. Mahvi made periodic demands to Thyssen for payment but was consistently put off. (D.I. 13 at 10; D.I. 13, Appendix 1 at 14.) This fact indicates that the cause of action now asserted could be nearly a decade old. 10 *Del.C.* § 8106; *Keller v. President, Directors & Co. of Farmers Bank,* Del.Super., 41 Del. 471, 24 A.2d 539, 541 (1942); *Haramson v. Delrose, Inc.,* 132 F.Supp. 440, 444 (D.Del. 1955). Dr. Gschwend's January 26, 1978 letter on behalf of Thyssen (D.I. 10, Exhibit B at K–19), is a complete repudiation of any contractual liability and powerful evidence that the plaintiff's cause of action is at least over six years old. 10 *Del.C.* § 8106; *Phoenix Finance Corp. v. Iowa-Wisconsin Bridge Co.,* Del.Super., 41 Del. 130, 16 A.2d 789, 794 (1940). To avoid the obvious outcome dictated by these facts, the plaintiff asserts four legal theories. None are persuasive.

■ First, the plaintiff argues that Dr. Gschwend, in May, 1981 negotiations seeking an out-of-court settlement to the West German litigation, made statements which constitute an acknowledgment by Thyssen, on behalf of the joint venture, of obligations owed to Messrs. Mahvi and Riahi. (D.I. 13 at 17.) Thus, the argument continues, the statute of limitations began to run anew from the date of the acknowledgment. (*Id.*) Even assuming the purported acknowledgment could be considered by the Court,[5] however, this argument still fails because of the long established and widely held rule that the acknowledgment, admission, or promise of one joint obligor does not revive as against the other a claim barred by the statute of limitations. *See, e.g., Peoples Trust Co. of Malone, N.Y. v. O'Neil,* 273 N.Y. 312, 7 N.E.2d 244, 245 (1937); *Homewood People's Bank v. McCutcheon,* 266 Pa. 116, 109 A. 873 (1920); 18 Williston on Contracts § 2079 (3d ed. 1968); *cf. Terry v. Platt,* Del.Super., 1 Penn. 185, 40 A. 243, 246 (1898). No evidence has been adduced indicating that the defendant authorized Dr. Gschwend to act as its agent to revive any expired obligations it might have had. Consequently, the Court must reject this theory as a basis for holding the defendant open to legal attack.

■ The second theory the plaintiff advances to save its claims from the statutory bar is that the "contract" is not one susceptible to total breach by the defendant, that it is rather an installment contract as to which each failure by the defendant to make payment to the plaintiff is a separate cause of action. (D.I. 13 at 26–34.) The plaintiff draws this conclusion (*id.*) from the promise in the memo that "Thyssen [will] . . . reserve a reasonable percentage payable over the period extending from award to finalization of [the] . . . contract(s)." (D.I. 10, Exhibit B at K–3.) By the plaintiff's reckoning, this means that

---

tations] starts to run on plaintiff's claims at the same times," (*id.* at 16), the Court takes it as stipulated that the parties agree to be bound by Delaware law on the accrual of the plaintiff's cause of action.

**5.** The defendant argues that Rule 408 of the Federal Rules of Evidence prohibits the admissibility of evidence of this offer to compromise and that accordingly, under Fed.R.Civ.P. 56(e), the Court may not consider that evidence in ruling on the summary judgment motion. Rule 408, which provides that evidence of compromise or compromise negotiations is generally inadmissible, does contain a clause stating, "[t]his rule . . . does not require exclusion when the evidence is offered for . . . negativing a contention of undue delay." But, as stated by the treatise plaintiff's counsel relied on at oral argument (D.I. 27 at 56–57), "Despite such a sweeping statement, care should be taken that an indiscriminate and mechanistic application of this 'exception' to Rule 408 does not result in undermining the rule's public policy objective. . . . The trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 408[05] at 408–26.

Without deciding the issue, the Court notes that the policy behind the exception to 408 seems to be the avoidance of prejudice to parties who, in justifiably relying on settlement negotiations, allow time deadlines to pass and that this policy is not served when the statute of limitations has already run before negotiations begin, as it had in this case, between the January 1978 repudiation and the May 1981 negotiations.

the Esfahan Venture was to make a percentage payment out of each payment the venture received from NIOC. Even if that interpretation of the promise is correct; however, the plaintiff's claims are not timely. Aside from Mr. Mahvi's allegation that he "believe[s] payments were made by NIOC to the Joint Venture between August 1978 and 1984," (D.I. 13, Appendix 1 at 14) the evidence is uncontroverted that the Esfahan Venture received no payments in the three years preceding the filing of this suit.[6] (*See* D.I. 22 at 2; D.I. 24 at 5.) An unsubstantiated belief is insufficient to create a material issue of fact, *e.g.*, Fed.R. Civ.P. 56(e); *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Chirinos de Alvarez v. Creole Petroleum Corp.*, 613 F.2d 1240, 1244 (3d Cir.1980); and accordingly the defendant's factual representations must be taken as truth and the plaintiff's claims for past payments must be held to have expired.

■ Any claims the plaintiff might have for future installment payments are, by the logic of the plaintiff's own argument, not yet available, for if the failure to make each separate payment constitutes a new and separate cause of action governed by a separate three-year statutory limitations period, then no cause of action presently exists for the recovery of future payments. This same logic is the undoing of the third theory plaintiff has advanced to defeat defendant's summary judgment motion.

According to the third theory, the contract is not an installment contract; it is simply a contract under which the defendant's duty to pay has not yet arisen. (D.I. 13 at 19–26.) While this theory does indeed relieve concern about the statute of limitations, its immediate effect is the destruction of the plaintiff's suit. Without a rip-

ened duty, there could be no breach[7] and hence no cause of action. Oddly enough, the plaintiff itself, in relating the outcome of another case, forcefully makes the argument which ends up arguing the plaintiff out of court on this theory: "[In *Jackson v. American Can Co.*, 485 F.Supp. 370 (W.D. Mich.1980),] [t]he court ... found that since anticipatory repudiation did not apply to a contract where one party had completed performance, plaintiff was required to wait until ... the time for performance ... to bring suit. Precisely the same reasoning and result should prevail in this case." (D.I. 13 at 31.) The Court agrees: if the plaintiff has a valid claim at all, it is yet only in embryo and the plaintiff must wait to bring suit.

■ The fourth and final legal theory the plaintiff advances to stave off the statute of limitations is that its equitable claims are timely even if its legal claims are not. (D.I. 13 at 35–36.) This theory is based on the plaintiff's claims for unjust enrichment and an equitable lien (D.I. 1 at ¶¶ 17, 19) against any recovery the defendant receives from Iran in the proceedings now pending before the Iran-United States Claims Tribunal. (D.I. 13 at 11–12.) The equitable claims, in turn, are based on the plaintiff's assertion that the Esfahan Venture was unjustly enriched when it received payments from NIOC in the mid-1970s but did not turn over any percentage of the payments to Messrs. Mahvi and Riahi. (D.I. 1 at ¶ 17.)

The plaintiff acknowledges that, "laches principles tend to measure delay in bringing suit by reference to statutes of limitation for analogous actions at law," (D.I. 13 at 35) *e.g.*, *Adams v. Jankouskas*, Del.S. Ct., 452 A.2d 148, 157 (1982); *Vrendenburgh v. Jones*, Del.Ch., 349 A.2d 22, 36

---

6. Indeed, plaintiff's counsel admitted at oral argument that no payments were made in the three years before this suit was filed. (D.I. 27 at 47.)

7. The doctrine of anticipatory breach has no place in this case because, as the plaintiff notes (D.I. 13 at 29–30), the weight of authority holds that anticipatory breach or repudiation has no

effect on a bilateral contract on which the non-breaching party has fully performed. 11 Williston on Contracts § 1300 (3d ed. 1968); 4 Corbin on Contracts § 989 n. 75 (1951); *cf. Smyth v. United States,* 302 U.S. 329, 356, 58 S.Ct. 248, 253, 82 L.Ed. 294 (1937); Restatement (Second) of Contracts § 243(3) (1981).

(1975); *Artesian Water Co. v. Lynch,* Del. Ch., 283 A.2d 690, 692 (1971), but argues that this general rule should not be applied in this case because the equities of the parties demand otherwise. (*Id.* at 35–39.) Even if the Court agreed with that assessment of the equities, and it does not, applying the doctrine of laches without reference to the statute of limitations still results in the plaintiff's claims being barred. From the plaintiff's own narration of the events leading up to this suit (*id.* at 7–14; D.I. 27 at 31–38), it is perfectly evident that, as long ago as 1975, the plaintiff's assignors of the claims, Messrs. Mahvi and Riahi, were convinced that their legal rights under the memo were being ignored. (D.I. 13, Appendix 1 at 14.) A letter from Mr. Mahvi to Dr. Gschwend threatening that plaintiff would file suit against Thyssen proves that the plaintiff believed at least as long ago as 1980 that to recover on its claims it had no course but legal action. (D.I. 24 at 3–4.) Only after losing its case in West Germany against Thyssen did the plaintiff bring this suit against Fluor. Considering these facts, a number of reasons can be imagined why the plaintiff failed to bring suit sooner, but none of them casts the plaintiff in a favorable light. The inescapable conclusion is that whatever equitable relief the plaintiff might have hoped for has long since evaporated.

For the foregoing reasons, the defendant's motion for summary judgment will be granted and an order will be entered to that effect.