In the Matter of Petition of Mulco Products, Inc. (Formerly John H. Mulholland Co.) to Open a Judgment and Have Said Judgment Determined to be Void and Stricken from the Record.

(*May* 1, 1956.)

TERRY, J., sitting.

*Aaron Finger* (of Richards, Layton and Finger) for the Petitioner.

*William H. Foulk* and *William Duffy, Jr.*, for the Respondent.

Superior Court for Sussex County.

No. 261 to October Term, 1953,

TERRY, J.:

At the hearing I considered the petitioner's testimony sufficient to require the opening of the judgment, ordered the same opened and proceeded to hear and determine the issues. I shall now set forth the material facts which I consider to be established by a fair preponderance of the evidence.

Hereinafter I shall refer to the petitioner, John H. Mulholland Co. (which later became the Welch Manufacturing Company, and is now Mulco Products, Inc.) as "corporation", to the respondent, Howard W. Black, as "Black", to Harry H. Mulholland, Sr., president of the corporation, as "Mulholland", and to Clarence M. Welch, Jr., as "Welch".

John H. Mulholland more than a quarter of a century ago organized and maintained in his individual capacity and under his personal direction a business with appurtenances in Milford,

Delaware, for the manufacture of certain wooden appliances, such as spoons. In the year nineteen twenty-two the business was incorporated under the name of John H. Mulholland Co.

Welch commenced his employment with the corporation as an office boy. His advancement was rapid. By April 7, 1942, he was Treasurer and General Manager of the corporation, as well as a corporate director. On March 25, 1948, he was elected to the office of Executive Vice-President.

On November 20, 1948, Welch and the corporation entered into a contract whereby Welch was to direct the corporate affairs and manage its business for a term of six years, ending December 31, 1953. He was to receive a fixed salary of $10,000 per year, and, in addition thereto, one-third of the net profits of the business before income taxes and profit-sharing distribution to employees, and after bonuses to key employees, which bonuses were to be established by Welch.

Welch's connection with the corporation was not restricted to his duties as General Manager, Executive Vice-President, Treasurer and Director. Subsequent to November 30, 1951, Welch had express director authority as Vice-President and Vice-President and Treasurer to borrow unlimited amounts from two named banking institutions, and as of June 29, 1953, he was the largest individual stockholder in the corporation, owning 640 of the 1,624 issued and outstanding shares thereof. The corporate minute book indicates that from November 30, 1951 to August 15, 1953, only two directors' meetings were held; one, on October 17, 1952, for the purpose of removing certain restrictions on the sale of the common stock of the corporation and the other, on March 20, 1953, for the purpose of requiring two signatures on corporate checks. The effect of the latter meeting will be hereinafter discussed. Thus it is clear that as of June 29, 1953 Welch, for all practical purposes ran the corporation and was, in point of fact, the *alter-ego* thereof.

Almost from its inception the corporation employed Black, a resident of Cleveland, Ohio, as a salesman. Black's territory

included Ohio, Michigan, West Virginia, Eastern New York and Eastern Pennsylvania. He continued to serve in this capacity until a few months prior to the commencement of this trial in November of 1955. He met Welch soon after Welch first came to the corporation as an office boy, and was impressed by reason of his rapid advancement in the corporation. He came to respect Welch's business judgment, and in time they became close personal friends. When Black needed assistance in closing a difficult sale, he would call upon Welch, and with Welch's aid the transaction was almost invariably consummated. On the basis of his many contacts with Welch, and Welch's evolution to a position of prominence in the corporation, he came to look upon Welch as, figuratively speaking, the corporation.

From time to time prior to the year 1953, Black had made personal loans to Welch in amounts varying from $5,000 to $15,000. These loans were secured by Welch's personal notes and were always paid.

In respect to those loans Black understood at the time they were made that the money representing the same was to be used in the corporate business in one way or another.

During the last week of June, 1953, Black received a call from Welch in his Michigan office. The testimony as to the conversation which subsequently transpired is in substantial conflict, both Black and Welch having taken the stand and presented conflicting versions. It has been my task to decide which version of this important telephone conversation to accept.

The record reflects that Welch's testimony is rife with internal inconsistencies. For instance, he testified first that he told Black that he needed money as his account with the corporation was short, and that he would send Black a corporate note in his capacity as Vice-President and Treasurer of the corporation with the intention on his part to pay the note when he purchased the Mulholland stock, which at that time he was endeavoring to do. Later he testified that upon reflection he found Black's testimony to be the true version of the conversation. I find Welch's testi-

mony to be of such character that I know of no judicial yard-stick with which to measure its accuracy. It may be best de-scribed in his own words: "I have tried to carry water on both shoulders too long. My position is untenable." I think it most charitable to say that I am unable to reconcile the many con-flicts in his testimony, nor can I accept it as being determinative in any respect with regard to the conversation at hand. I there-fore accept in every pertinent respect Black's testimony as to that conversation. He testified as follows:

" 'Howard, how are you fixed for money?', and I said, 'Well, I have a little. Why do you ask?', and he said, 'As you know, we have arranged with, I think it was Harriman, Ripley, the com-pany is going to buy out Harry Mulholland, but the company is going to buy—borrow this money to buy this stock, and we have some machinery to be paid for and we have quite a few debts I would like to clean up right away. How much can you loan me?', and I said, 'Well, the cherry season is very close to here and I am going to need all of my money in a short time to buy cherries,' and he said, 'How much could you spare me for thirty days?', and I said, 'About maybe, $15,000 or $20,000 or $25,000, but for 45 days, at the outside,' and he said, 'Well, this is a company deal and I will send you a company note for $25,000, and will it be all right to make it for 45 days?', and I said, 'Yes.' "

Pursuant to the foregoing conversation Welch mailed to Black's Michigan office a note of the corporation signed by Welch as Vice-President and Treasurer in the amount of $25,000 dated June 29, 1953. The note was to mature 45 days later.

Black was not in his office at the time the note actually arrived but he telephoned instructions to his secretary to send "them" a check. At the same time he dictated a letter to Welch to the effect that the note would have to be paid at maturity. Black's secretary, a Mrs. Fry, instead of drawing the check to the order of the corporation, drew the check inadvertently to the order of Welch and mailed it to him in care of the corpora-

tion, Milford, Delaware. Mrs. Fry signed Black's name to the check as drawer, having been given the power as attorney in fact so to do.

On or about July 2nd Welch received the $25,000 check, endorsed it and deposited it in the corporate account at the Milford Trust Company. He then proceeded to the offices of the corporation and instructed Donohoe, the bookkeeper, to credit the deposit to his personal account with the corporation.

During the period of time to which I am presently alluding Welch's relations with the corporation were strained. On March 19, 1953, Mulholland, who was then in Florida, learned that the corporate account in the Milford Trust Company was overdrawn in the amount of $1,600. He immediately returned to Milford and after consultation with Donohoe, the bookkeeper, discovered that Welch as of that date had improperly withdrawn an amount in excess of $35,000 from the corporate account at the Milford Trust Company.

Welch being away from Milford at the time, Mulholland called a special meeting of the Directors on March 20th. At this meeting the Directors adopted a resolution to the effect that all checks on the corporate bank accounts should bear the signatures of two officers of the corporation, thus restricting Welch's authority to draw corporate checks under his signature alone. Upon Welch's return to Milford he persuaded Mulholland not to deliver this resolution to the banks, as it would hurt his prestige with the employees and it would hinder any possibility of his borrowing money to square up his personal account. During this discussion Welch suggested that Mulholland take over the accounts payable, tender to Welch the ones to be paid together with a check for Welch's signature and that he would sign the same. Mulholland agreed to Welch's suggestion, took care of the accounts payable as indicated and submitted the checks to be drawn therefore to Welch, which Welch alone signed.

On August 9th Mulholland discovered that Welch had improperly withdrawn an additional $9,500 from the corporate

account during the month of July. On that date Mulholland delivered to the Milford Trust Company the March 20th resolution requiring the signatures of two officers on any corporate checks. Mulholland then called Welch with reference to these improper withdrawals during July. At that time Welch stated to Mulholland, "Harry, I know what you want to talk to me about. I am ashamed to talk to you. * * * I can't face you now, and I will stay out until I can get the money to buy your stock or quit." I find, as of the date of this statement, that Welch temporarily surrendered the duties under his many corporate offices.

Welch remained absent from the corporation from August 9th until September 29, 1953. During August, but prior to August 13th, the date of the maturity of the $25,000 note, Welch called Black in Michigan and suggested that they meet in Detroit. Black went to Detroit thinking at the time that Welch was going to pay the note. It developed at the meeting, however that Welch for the first time wanted to interest Black in a portion of the stock of the Welch Manufacturing Company, the company Welch proposed to operate under a change in name from the corporation upon his purchase of the stock holdings of the Mulholland family. It was agreed that Black would take 20% of the stock, or 200 shares, in the new company, $25,000 of which was to be paid for by the corporate note then in existence. Black agreed to send to Welch a check for $8,000, representing the remainder of the purchase price of the shares, and did send the check shortly after the 13th of August. This check was originally drawn to the order of the corporation but was later returned, and a new check, at Welch's suggestion, was made out to the order of Welch personally. On September 29th Welch purchased the Mulholland stock. The name of the corporation was then changed to Welch Manufacturing Company, which Welch operated until some time early in November, 1953.

On or about November 7th Mulholland went to the Milford Trust Company to inquire where Welch had obtained the $25,000 that he paid to the corporation on July 2nd. He then

learned of Black's check to Welch. Mulholland immediately called Black in Michigan to inquire of Welch's whereabouts since Welch had absconded from Milford during the interim. Black upon this occasion told Mulholland that he did not know of Welch's whereabouts but that he held the note of the corporation for $25,000 and was promised by Welch 200 shares of stock in the new company, the Welch Manufacturing Company. Black at no time prior to this telephone conversation with Mulholland had any knowledge or reason to know of any irregularities of Welch in dealing with corporate matters.

Later in November the banking institution which had loaned Welch $160,000 to purchase the Mulholland stock called the loan and upon non-payment thereof sold the stock which had been pledged as collateral, thus disposing entirely of Welch's interest and ownership in the then Welch Manufacturing Company.

The $25,000 note was never paid, and the stock transaction above referred to was never in fact consummated. Black obtained judgment upon said note in this court by confession in the amount of $25,000 on November 16, 1953, the judgment being No. 261 of the October Term, 1953.

The corporation advances the following contentions:

(1) That the evidence demonstrates overwhelmingly that Black's loan of $25,000 evidenced by his check dated July 1, 1953, drawn to the order of Welch, was made to Welch personally and not to the corporation.

(2) That Welch did not possess (a) express (b) implied or (c) apparent authority as of June 29, 1953, to give to Black the corporation's note in the amount of $25,000.

(3) That no consideration passed to the corporation from Black since he drew his check of $25,000 dated July 1, 1953, to the order of Welch and not to the order of the corporation, and since Welch subsequently used the check to reduce his personal indebtedness to the corporation.

(4) That the transaction which occurred in Michigan between Black and Welch subsequent to August 13, 1953, in relation to Black's purchasing shares of stock in the Welch Manufacturing Company, eliminated every semblance of a claim by Black against the corporation.

██ For the purpose of organizational convenience I shall deal with the corporation's four basic arguments *seriatim*:

(1) The basic and essential question raised by the corporation's first contention is whether Black's check in the amount of $25,000 made out to the order of Welch and dated July 1, 1953, constituted a loan to the corporation or a loan to Welch personally. The preponderance of the evidence leads to the inescapable conclusion that Black's $25,000 check, dated July 1, 1953, represented a loan to the corporation and not a loan to Welch personally.

(2) The second contention deals with the question of Welch's authority to give Black the corporation's note on June 29, 1953.

██ It is axiomatic that a corporation by structural necessity must act, if it acts at all, through its agents. *Atlantic Refining Co. v. Ingalls & Co., Inc.,* 7 *W. W. Harr.* 503, 185 *A.* 885; *Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.,* 4 *W. W. Harr.* 567, 156 *A.* 350; 2 *Fletcher Corp.* (1954 Ed.) § 275. Consequently in any situation where the power of an agent to bind his principal is put in issue, the agent's authority becomes a matter of paramount importance.

██ The authority of an agent may fall generally into two categories, actual and apparent. The actual authority of an agent of a private corporation in turn lends itself to dichotomy. It may consist of express authority granted the agent either by statute, corporate charter, by-law, or corporate action by the stockholders or Board of Directors. Or it may amount to implied authority, another way of saying that certain powers spring by necessary inference from those expressly granted.

A second broad category of authority is not actual authority, being neither express nor implied. This class is commonly labelled apparent authority. In nature and effect, when a private corporation is the principal, it amounts to that authority which, though not actually granted, the principal knowingly or negligently permits the agent to exercise or which it holds him out as possessing. Thus in respect to apparent authority, when an agent of a corporation possesses such authority, the corporation is bound by the act of the agent within the scope of his apparent authority as to any person who believes and has reasonable ground to believe that the agent has such authority and in good faith deals with him. In such a case the corporation will be bound to the same extent precisely as if the apparent authority were real or actual authority.

The issue of actual authority, whether express or implied, is decided solely by scrutinizing the relationship of the agent and the corporation. The means of determining the existence of apparent authority has been defined above.

Although there is ample authority as to the principles above stated, some of the writers nevertheless appear to have difficulty in applying the concepts to particular factual situations. Some hypothetical applications of my notion of the law may, therefore, be appropriate. If X, an agent, is expressly authorized by Y, his principal-corporation, to borrow money from Z, an individual, and in fact does so, upon default a cause of action in Z's favor against Y would spring into being. The authority of X being a fact, the status of Z's knowledge as to said authority would be immaterial provided only that Z acted in good faith, and precisely the same result would flow if X's authority were implied rather than express, for "implied authority is actual authority circumstantially proved." 2 *Fletcher Corp.* (1954 Ed.) § 449.

Assume, however, that X has no actual authority, either express or implied. In such a case Y would be bound only if Z believed, and had reasonable grounds to believe, that X had

the authority to borrow money from him on behalf of Y, and in good faith loaned the money. The reasonableness of Z's belief and his grounds therefore would necessarily be governed by the manner in which Y, knowingly or negligently, permitted X to exercise apparent authority or by the manner in which Y held X out as possessing authority.

(a) In applying the foregoing principles to the instant case the first question which presents itself is whether Welch had actual authority to borrow money from Black on behalf of the corporation. Black does not contend that express authorization existed. Therefore, such actual authority, if it existed at all, must be implied.

(b) While it may be true that a General Manager in the ordinary sense does not have implied authority to borrow, it is held generally that the General Manager of a corporation entrusted with the entire management and control of its business has implied power to borrow money for the legitimate purposes of the corporation in its current and usual business, and that he need not have express authority for the purpose. *Glidden & Joy Varnish Co. of Ohio v. Interstate Nat. Bank*, 8 Cir., 69 *F.* 912; 2 *Fletcher Corp.* (1954 Ed.) § 679; 19 *C. J. S., Corporations*, § 1059, p. 582.

In this connection Judge Rodney, in the case of *Phoenix Finance Corporation v. Iowa-Wisconsin Bridge Co.*, 2 *Terry* 130, 16 *A.* 2d 789, 793, stated: "A general manager, is as the term indicates, a manager for all the general purposes of the corporation, and has implied authority to do anything that the corporation could do in the general scope and operation of its business."

It follows that Welch, being General Manager, Executive Vice-President, Treasurer and a Director of the corporation, and vested with the entire management and control of its business had, as of June 29th, implied authority to borrow money from Black for corporate purposes unless such implied authority can be shown to have been revoked or restricted.

The corporation takes the position that, notwithstanding the fact that no director action was ever taken to remove Welch from the offices of General Manager, Executive Vice-President, Treasurer or Director of the corporation, nevertheless his authority as General Manager to borrow money for corporate purposes was revoked or restricted by reason of the adoption of two resolutions by the Board of Directors.

The first resolution was passed on November 15, 1946, and declared:

"Resolved that the President, Harry H. Mulholland, and or the Treasurer, Clarence M. Welch, be and are hereby authorized to borrow money from time to time for the operation of the business from the Corn Exchange National Bank and Trust Co., Philadelphia, Pennsylvania, and the Secretary is hereby instructed to send a copy of the resolution to the said Bank."

On November 30, 1951, the following resolution was passed:

"Resolved, that the Vice-President and Treasurer C. M. Welch, be and is hereby authorized to establish a banking connection with the Security Trust Company of Wilmington, Delaware, and that the President, Harry H. Mulholland and/or the Vice President, C. M. Welch, be and are hereby authorized to borrow money from time to time from the said Security Trust Company and sign notes, agreements, assignments, etc., for the transaction of such business."

 The corporation earnestly submits that these two resolutions restricted the places at which money could be borrowed and the capacity in which Welch could properly borrow it. I cannot so conclude. By virtue of the broad managerial functions he exercised, Welch clearly had, by necessary implication, the general power to borrow whatever money the business needed from any source willing to lend it. To construe the resolutions as limiting these powers would be to write into them a restriction which they do not contain. The only reasonable construction to which these resolutions are subject is that they establish

a procedure which Welch, if he had so chosen, could have followed. If the Board of Directors had intended that Welch could borrow money only from the Corn Exchange National Bank and Trust Company of Philadelphia, and the Security Trust Company of Wilmington, and then only in his capacities as Treasurer, or Vice-President and Treasurer, respectively, thereby revoking or restricting his general authority as manager of the corporate affairs to borrow upon the open market, they could easily have done so by expressing such an intention in the resolution.

The corporation additionally argues that the resolution of March 20, 1953, relating to Welch's authority to sign checks together with the agreement between Welch and Mulholland in respect to the handling of accounts payable, set out in the statement of facts, revoked or restricted Welch's implied power to borrow money. The corporation, as with its argument relating to the two resolutions previously set forth, seeks to have me read into this resolution a meaning by innuendo which the resolution itself does not reasonably suggest. I find this contention to be without merit. That the Board of Directors could have revoked Welch's general power to borrow by direct action is beyond dispute. That it did so by the indirection of this resolution I cannot believe. I find that Welch's authority as General Manager entrusted with the entire management and control of the business, instead of being revoked because of his improper conduct in withdrawing corporate funds for his own use, was merely restricted in the particular respects indicated. His general authority to borrow money for corporate purposes was not curtailed.

I further conclude that Black's dealings with Welch were conducted, on Black's part, in the exercise of good faith.

It is therefore my conclusion that Welch possessed implied authority to borrow the $25,000 from Black on June 29, 1953, for corporate purposes, notwithstanding the contentions to the contrary as hereinabove asserted by the corporation.

(c) In considering the question of whether or not Welch, on June 29, 1953, possessed apparent authority to give to Black the corporation's note for $25,000 we will assume *arguendo* that the resolutions establishing avenues for borrowing purposes revoked the authority of Welch as General Manager to borrow except from the institutions and in the capacities named therein. Therefore, Welch would not have had implied authority to borrow from Black on June 29, 1953, but notwithstanding the absence of express or implied authority to borrow on the part of Welch yet it might be said that he possessed apparent authority to borrow provided the circumstances justify such a conclusion.

Although the words used to describe apparent authority vary somewhat, it is most widely defined as "that (authority) which, though not actually granted, the principal knowingly (or negligently) permits the agent to exercise or which he holds him out as possessing." 2 *Fletcher Corp.* (1954 Ed.) § 449. See also *Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.,* 4 *W. W. Harr.* 567, 156 *A.* 350; *De Parcq v. Liggett & Myers Tobacco Co.,* 8 *Cir.,* 81 *F.* 2d 777; *O'Donnell v. Union Paving Co.,* 121 *Pa. Super.* 68, 182 *A.* 709; *Campbell Paint & Varnish Co. v. Ladd Furniture & Carpet Co., Tex. Civ. App.,* 83 *S. W.* 2d 1095; *Sheldon Petroleum Co. v. Empire Gas & Fuel Co.,* 112 *Kan.* 73, 209 *P.* 826; *Povey v. Colonial Beacon Oil Co.,* 294 *Mass.* 86, 200 *N. E.* 891; *Norelli v. Mutual Savings Fund Harmonia,* 121 *N. J. L.* 60, 1 *A.* 2d 440.

Although apparent authority is not actual authority, once the authority of the agent has been established, and it is shown that the third party relying on the apparent authority did so rely in good faith and was justified from all the circumstances in so relying, the corporation is bound to the same extent as though actual authority had existed. *Thompson on Corporations* (3rd Ed.) § 1800.

A review of the testimony establishes beyond any doubt whatsoever that Welch was endowed with all the necessary elements of apparent authority, as hereinabove defined, in his

dealing with Black. I find that Welch possessed apparent authority on June 29, 1953, to give to Black the corporation's note for $25,000. I further find that Black had reasonable ground to rely upon Welch's apparent authority in accepting the note from Welch and that his acceptance was in good faith.

Assuming *arguendo* that the resolutions of November 15, 1946, November 30, 1951 and March 20, 1953 (the effect of which I have previously discussed) revoked or restricted Welch's actual authority to borrow, as the corporation contends, such a conclusion would be immaterial in deciding the issue of apparent authority. No notice of these restrictions was communicated to Black and the apparent authority of an agent is not restricted by any secret limitations placed upon that agent by his principal unless and until the notice of said limitations is communicated directly or indirectly to third persons dealing with the agent. *Commodity Credit Corp. v. Usrey*, 199 *Ark.* 406, 133 *S. W.* 2d 887; *Wright v. Iowa Power & Light Co.*, 223 *Iowa* 1192, 274 *N. W.* 892; *Restatement of Agency* § 160.

(3) The corporation under its third contention argues that no consideration passed to it from Black, since Black made his check payable not to the order of the corporation but to Welch, and since Welch subsequently used the check to reduce his personal indebtedness to the corporation. In this connection I hold that payment of the money by Black to Welch constituted constructive payment to the corporation, and if Welch misappropriated the same, the corporation will not be heard to deny that it received the benefit of the loan. Welch having the authority to borrow and in fact borrowing for the corporation, Black was under no duty to see that the money was applied to corporate purposes and not misappropriated by Welch. *Watson v. Proximity Mfg. Co.*, 147 *N. C.* 469, 61 *S.E.* 273; *Peoria Life Insurance Co. v. International Life & Annuity Co.*, 246 *Ill. App.* 38; *Oklahoma Asphalt, Paint & Roofing Co. v. Phillips*, 14 *Ga. App.* 356, 80 *S. E.* 863; *Martin & Co. v. Logan*, 30 *Ky. Law Rep.* 799, 99 *S. W.* 648; *Helena National Bank v. Rocky Mountain Telephone Company*, 20 *Mont.* 379, 51 *P.* 829; 2 *Fletcher Corp.*

(1954 Ed.) § 473; 3 *Thompson on Corporations* (3rd Ed.) §§ 1700, 1701.

 (4) Under its fourth contention the corporation maintains that Black released any claim which he might theretofore have had against it when he agreed to purchase 20%, or 200 shares, of the Welch Manufacturing Company stock, which in part was to be paid for by the $25,000 note then held by him. I am unable to accept this contention. The testimony in relation to this transaction is not ambiguous in any respect. It is quite clear that neither Black nor Welch contemplated nor intended that the corporation should be relieved of any liability in respect to the $25,000 note until such time as Black received the 200 shares of stock of the Welch Manufacturing Company. The transaction was never consummated in that Welch became ill and the pledgee of his shares foreclosed its loan, thus divesting Welch completely of any interest whatsoever in the corporation.

For the reasons hereinabove indicated the corporation's petition must be dismissed. An order will be entered accordingly.