

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-29-1998

# Schoonejongen v. Curtiss Wright Corp

Precedential or Non-Precedential:

Docket 97-5497

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Schoonejongen v. Curtiss Wright Corp" (1998). *1998 Decisions*. Paper 94.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/94

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 29, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5497

FRANK C. SCHOONEJONGEN; WESLEY L. LOSSON;
JOHN S. DUNNING; WILLIAM MARTONE; WILLIAM V.
HANZALEK; EDWARD F. ZIEK; MELVIN DEBLOCK;
JOSEPH COLQUHOUN; JOSEPH MAJERSCAK; GERARD
ABBAMONT; and OLGA WOLSEY, on behalf of themselves
and all others similarly situated,

        Appellants

v.

CURTISS-WRIGHT CORPORATION

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. No. 84-cv-04542)

Argued March 17, 1998

Before: SLOVITER, RENDELL and SEITZ, Circuit Judges.

(Opinion Filed: April 29, 1998)

        Nicholas F. Lewis, Esquire (Argued)
        Everett E. Lewis, Esquire
        Shirely Fingerhood, Esquire
        Lewis, Greenwald, Clifton & Lewis
        218 West 40th Street
        New York, New York 10018
         Attorneys for Appellants

        Stephen F. Payerle, Esquire (Argued)
        Laurence Reich, Esquire
        Carpenter, Bennett & Morrissey
        100 Mulberry Street
        Newark, New Jersey 07102-4079
         Attorneys for Appellee

OPINION OF THE COURT

SEITZ, Circuit Judge.

The sole but important issue in this appeal, which stems from an action alleging a violation of section 402(b)(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. S 1102(b)(3) ("ERISA"), has already been framed for us by the Supreme Court in its mandate to our court on remand.1 In particular, we will address the question directly posed by the Supreme Court: "[W]hether Curtiss-Wright's valid amendment procedure -- amendment `by the company' -- was complied with in this case." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 85 (1995). The parties agree that we should apply principles of Delaware corporate law to resolve that question. See Schoonejongen v. Curtiss-Wright Corp., Nos. 92-5695, 92-5710 (3d Cir. Aug. 30, 1995) (unpublished opinion).

I. Factual Background

A. Procedural History

The long and contentious history of this case, which spans over fourteen years of litigation, is set forth in Schoonejongen v. Curtiss-Wright Corp., 18 F.3d 1034 (3d Cir. 1994), when this court first considered the matter. To summarize, the Curtiss-Wright Corporation ("CW") actively maintained a retirement health benefits plan ("the Plan") for

_____

1. The district court asserted subject matter jurisdiction pursuant to the civil enforcement provisions in ERISA, 29 U.S.C. S 1132. Jurisdiction of this court arises out of 28 U.S.C. S 1291 to review the district court's final order granting summary judgment.

all non-bargaining unit employees who worked at its production facilities, including one such plant in Wood Ridge, New Jersey. These retirement health benefits, granted in 1966, were governed by two principal documents: the Plan Constitution and the Summary Plan Description ("SPD"). In early 1983, CW purportedly issued an amended SPD providing that upon the closure of a CW plant, health benefits for that facility's retirees would be terminated.[2] Later that year, CW closed its Wood Ridge plant and accordingly notified the plant's retirees of the termination of health benefits. Mr. Richard Sprigle, who was the Executive Vice President in charge of the facility's operations, informed Wood Ridge retirees of this termination under the amended SPD by a letter dated November 4, 1983.

In 1984, the affected retirees instituted a class action in the district court, alleging that CW had wrongfully terminated their retirement health benefits and that they had a vested right to these benefits for life. After six years of litigation and a bench trial, the district court in 1990 dismissed most of the plaintiffs' claims, including one contention that CW had contractually bound itself to provide retirement health benefits for life. The district court found, however, that the revised SPD language concerning the termination of benefits constituted an "amendment" to the Plan and therefore fell within ERISA's section 402(b)(3), which requires that every employee benefit plan must "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. S 1102(b)(3). The district court then held that, as an amendment, the relevant SPD language was not adopted under an amendment procedure as required by ERISA. Therefore, the district court concluded that the terminations of health benefits under the amended Plan were void ab initio and ordered CW to pay a significant amount in retroactive benefits.

_____

2. This addition to the SPD, found under the heading "Termination of Health Care Benefits," reads: "Coverage under this Plan will cease for retirees and their dependents upon the termination of business operations of the facility from which they retired." App. at 334.

On appeal to our court, CW argued that the revised SPD language was in fact adopted under an amendment procedure contained in a standard reservation clause which provided that "[t]he Company reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all of the provisions of the Plan." CW contended that this procedure was valid under section 402(b)(3) because it identified "the Company" with the authority to amend the retirement benefits plan. This court rejected that argument, reasoning that the purpose behind the section 402(b)(3) requirement was to "ensure that all interested parties will know how a plan may be altered and who may make such alternations. Only if they know this information will they be able to determine with certainty at any given time exactly what the plan provides." Schoonejongen v. Curtiss-Wright Corp., 18 F.3d 1034, 1038 (3d Cir. 1994). As a result, our court reasoned that section 402(b)(3) requires enumeration with specificity "what individuals or bodies within the Company could promulgate an effective amendment." Id. at 1039. Because simply identifying "the Company" did not explicitly identify such individuals or bodies, the court affirmed the district court, holding that CW adopted the revised SPD under an amendment procedure that failed to comply with ERISA section 402(b)(3).

The Supreme Court granted CW's petition for certiorari and reversed in a unanimous opinion. The Court observed that the text of section 402(b)(3) contains only two requirements: "a `procedure for amending [the] plan' and `[a procedure] for identifying the persons who have authority to amend the plan.' " Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995) (quoting 29 U.S.C. S 1102(b)(3)) (alteration and emphasis in original). Next, the Court held that merely identifying "the Company" with the authority to amend the plan comports with a literal reading of the section, as nothing in the statute required an identification with any more particularity. The Court noted, however, that for "the Company" language to make sense, there must be some reference to principles of corporate law in order to determine who has authority to make decisions on behalf of a company.3 Id. at 80-81. As to whether CW's reservation

_____

3. The Supreme Court cited Judge Roth's concurring reasoning on this point. See Curtiss-Wright, 514 U.S. at 80 (citing Schoonejongen, 18 F.3d at 1039 n.3).

4

clause constituted a procedure for amending the plan, the Court once again reasoned that the literal terms of section 402(b)(3) are ultimately indifferent as to the level of detail in an amendment procedure or in an identification procedure. Because the unilateral authority to terminate a plan is still a "procedure" nonetheless, the reservation clause, in the Court's view, satisfied this prong of section 402(b)(3).

The Court then remanded the case to our court to determine "whether Curtiss-Wright's valid amendment procedure -- amendment `by the Company' -- was complied with in this case." Id. at 85. The Supreme Court instructed us that "[t]he answer will depend on a fact-intensive inquiry, under applicable corporate law principles, into what persons or committees within Curtiss-Wright possessed plan amendment authority, either by express delegation or impliedly, and whether those persons or committees actually approved the new plan provision contained in the revised SPD." Id. If, the Court continued, the revised plan is found not to have been properly authorized when issued, the question would then arise whether any subsequent actions attributable to CW could serve to ratify the amendment ex post. The Court specifically identified as a possible basis for ratification the November 4, 1983 letter under Mr. Sprigle's name informing individual retirees of the termination. Id.

On remand from the Supreme Court, both parties argued before us that it was possible to decide the case on the existing record. The panel, however, decided that a remand to the district court was appropriate because of a factual dispute -- namely, whether anyone at CW possessed the actual or implied authority to amend the plan. See Schoonejongen v. Curtiss-Wright Corp., Nos 92-5695, 92-5710 (3d Cir. Aug. 30, 1995) (unpublished opinion). In remanding, we rejected the argument raised by CW that the Board in 1990 had retroactively ratified the Plan by resolution so that there was no need to consider questions of authority. We held that under Delaware corporate law a "[r]atification cannot relate back so as to defeat intervening rights of strangers to the transactions." Id. at 4 (quoting 2A William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations S 782, at 647-48 (perm. rev. ed. 1992))

5

(alteration in original); see also Essential Enterprises Corp. v. Automatic Steel Prods., Inc., 164 A.2d 437 (Del. Ch. 1960). Because the ex post ratification of the amended SPD would defeat the rights of third parties, this court rejected the 1990 attempted ratification by the board and accordingly remanded the matter to the district court for further proceedings with respect to the actual or implied authority of CW to adopt the 1983 amendment or to ratify it.

B. Facts Discovered on Remand

Renewed discovery by the parties in the district court revealed the following undisputed facts. CW is a Delaware corporation and has adopted by-laws applicable at all times here pertinent which gives the Chairman of the Board of Directors, as Chief Executive Officer ("CEO"), "general and active control of [the corporation's] business and affairs." App. at 441. They expressly include the authority to sign all contracts, obligations, and other instruments on behalf of the corporation. Id. The by-laws further designate the President as the Chief Operating Officer and bestow "general and active control of [the corporation's] operations," including the authority to execute contracts, fix employee compensation other than primary officers, and "all other duties and powers usually appertaining to the office of president of a corporation," except as otherwise stated in the by-laws. Id. at 441-43. Finally, the by-laws provide that the Vice-Presidents "shall perform all such duties and exercise all such powers as may be provided by these by-laws or as may from time to time be determined by the Board of Directors, ... the Chairman, or the President." Id. at 443.

Mr. T. Roland Berner, who died in the spring of 1990, long before remand to the district court, was CW's Chairman of the Board, CEO, and President. Mr. Charles Ehinger and Mr. Richard Sprigle, both now retired, were CW's two Executive Vice Presidents. While the precise responsibilities of Mr. Ehinger and Mr. Sprigle are the subject of some disagreement between the parties to this action, although not between the two Vice Presidents themselves, it is not disputed that Mr. Ehinger generally

6

handled corporate staff issues for all CW employees and Mr. Sprigle was essentially in charge of operations at the Wood Ridge facility in New Jersey. App. at 181, 247.

Discovery before the district court also yielded the following undisputed facts relating to the Plan's history. CW's post-retirement and health benefits plan was established, implemented, and administered without any formal board action other than a 1976 authorization of an undertaking to self-insure its health insurance plans and an adoption of a Trust Agreement in connection with that self-insurance. There is no written delegation of authority over Plan matters to any particular corporate officer, either by name or by title. On September 1, 1976, Mr. Ehinger executed a Plan Constitution as the general instrument governing welfare benefits, and thereby purported to create a CW retirement benefits Plan that complied with ERISA. The board took no part in this action, and its minutes are completely silent as to Plan matters until November 8, 1990, when it sought to retroactively ratify the 1983 SPD amendment at issue. In 1978 and 1981, Plan amendments providing for an adjustment of health benefits had been made by certain managers working under Mr. Ehinger's direction. App. at 337-39. Again, corporate records do not show formal involvement by either the board or Mr. Berner with respect to these amendments.

It is undisputed that Mr. Richard A. DuBois, the Corporate Manager for Benefits, and Mr. Aaron J. Carr, CW's labor counsel, initially drafted the 1983 SPD amendment providing for the termination of health benefits for a closed plant's retirees. Here the parties' accounts begin to diverge. CW contends, based on the deposition testimony of Mr. Ehinger and Mr. Sprigle, that Mr. Berner, the President, orally delegated the authority to deal with Plan matters to Mr. Ehinger. It further argues that Mr. Ehinger explicitly authorized Mr. DuBois and Mr. Carr to draft the necessary language in the SPD amendment which would provide for a termination of health benefits upon the closing of a CW plant. CW points to Mr. Ehinger's assertions in his deposition that he read the provision at issue and approved it pursuant to his authority over Plan administration. App. at 195-97. Plaintiffs, on the other

7

hand, strenuously dispute in their briefs the testimony of
Mr. Ehinger that he had intentionally amended the SPD
based on an oral delegation of authority by Mr. Berner.
Pointing to various alleged inconsistencies in Mr. Ehinger's
deposition, plaintiffs emphasize that CW issued the SPD
amendment without ever intending it to be a substantive
change in policy.

## C. The District Court's Disposition on Remand

Based on the record developed on remand, the district
court considered the motions for summary judgment
submitted by the plaintiffs and by CW. In initially
addressing the issue of authority, the court found, relying
on its earlier opinion, that CW intended to amend the Plan
in 1983 and did not, as plaintiffs argued, merely seek to
clarify existing coverage.[4] Second, the district court
identified Mr. Berner as one who possessed the express
authority to amend the SPD in 1983 based on its reading
of the corporate by-laws. The court further observed that
the corporation vested Mr. Ehinger with an implied
authority to undertake such action because he had
originally executed the Plan Constitution with the board's
knowledge. Notably, however, the district court refused to
find that Mr. Berner orally delegated authority to Mr.
Ehinger, despite Mr. Ehinger's deposition to that effect,
because there were "issues of credibility" which the court
considered inappropriate for resolution at the summary
judgment stage. Nevertheless, having concluded that Mr.
Ehinger possessed the necessary authority to amend the
SPD in 1983 based on the board's silence, the district court
held that a genuine issue of material fact existed as to
whether Mr. Ehinger actually approved the revised SPD
provisions under his authority. Here, the court once again
observed that the only support for Mr. Ehinger's actual

_____

4. Plaintiffs on appeal continue to press their argument that CW never
intended to "amend" the Plan, but only sought to include this language
as a "clarification" of existing coverage. We agree with the district
court
and find this issue settled by its initial finding, after a bench trial,
that
"the language ... providing for a termination of benefits in the event of
a
plant closing constituted an amendment of the plan, not a clarification
of existing terms...." App. at 34.

8

approval was his own testimony at deposition, which it also concluded would not constitute an appropriate basis for summary judgment because issues of credibility remained.

Because the district court did not find that anyone at CW with authority to amend the Plan actually approved the SPD amendment, it addressed whether the doctrine of ratification provided an appropriate alternative basis to hold the 1983 Plan amendment as a valid corporate act. Here, the district court concluded that the 1983 letter bearing Mr. Sprigle's name and on CW letter head served to ratify the revised SPD. Reasoning that Mr. Sprigle possessed the authority to act on behalf of the Wood Ridge facility, the letter to that plant's retirees advising them of the health benefits termination could be considered an authorized act on behalf of CW. Thus, the district court concluded that even if Mr. Carr and Mr. DuBois had revised the SPD without authority from Mr. Ehinger, Mr. Sprigle's subsequent actions constituted a valid corporate act ratifying the Plan amendment.

Plaintiffs now appeal the district court's grant of summary judgment in favor of CW. Our standard of review is plenary. Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1158 (3d Cir. 1990).

II. Authority

As we have noted, the district court refused to find, at the summary judgment stage, that any corporate officer with the appropriate authority actually authorized the 1983 SPD amendment, despite CW's argument to the contrary. CW renews that same contention before us, which the plaintiffs again oppose.

In considering the issue of a valid amendment procedure under ERISA section 402(b)(3) -- amendment by "the Company" -- the Supreme Court held that principles of corporate law provide a ready-made set of rules for identifying the natural persons authorized to make decisions on behalf of a company. Curtiss-Wright, 514 U.S. at 80. Thus, the Court's mandate requires us to determine whether there was compliance with Curtiss-Wright's valid amendment procedure, which necessarily entails a fact-

intensive inquiry into "what persons or committees within Curtiss-Wright possessed plan amendment authority, either by express delegation or impliedly, and whether those persons or committees actually approved the new plan provision contained in the revised SPD." Id. at 85 (citing 2 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations S 444, at 397-98 (perm. rev. ed. 1992)). Indeed, as the Supreme Court emphasized, only natural persons make decisions and the issue now before us is whether, on the record, those persons who amended the SPD in 1983 acted with corporate authority so that the Plan's amendment is properly characterized as a valid corporate act or, to use the parlance of ERISA section 402(b)(3), was an amendment by "the Company."

A. Who Possessed the Authority to Amend the Plan?

1. The Board's Authority to Amend the Plan and Delegate Plan Matters

Because it is tacitly conceded that the board possessed the authority to amend the Plan, see Del. Code Ann. S 141(a), but never actually undertook such an amendment, we pause to address the plaintiffs' argument that only the board of directors had authority to adopt amendments to the Plan in this case. The answer must be that unless otherwise provided by the certificate of corporation and subject to the limitations set forth in 8 Del. Code Ann. S 141(c), the board may freely delegate the authority to manage the business and affairs of the corporation. See 1 R. Franklin Balotti & Jesse A. Finkelstein, The Delaware Law of Corporations & Business Organizations S 4.17, at 32 (collecting cases). Indeed, the ability to delegate is the essence of corporate management, as the law does not expect the board to fully immerse itself in the daily complexities of corporate operation. See Grimes v. Donald, 673 A.2d 1207, 1215 (Del. 1996) (The board "retains the ultimate freedom to direct the strategy and affairs of the Company."); Cahall v. Lofland, 114 A. 224, 229 (Del. Ch. 1921) ("The duties of directors are administrative, and relate to supervision, direction and control, the details of the business being delegated to inferior officers, agents and

10

employees. This is what is meant by management."); 1 Balotti & Finkelstein, supra, S 4.17. The record does not suggest that the board's delegation of the administration or amendment of the Plan would violate CW's certificate of corporation or the specific prohibitions embodied in section 141(c) of the Delaware code.

Nor do we agree with the plaintiffs' assertion that the delegation of Plan matters, including its amendment, to a corporate officer or agent would necessarily constitute an abdication of managerial duties. The business decision of appointing a corporate officer to manage retirement health benefits for the corporation does not have the effect of "removing from directors in a very substantial way their duty to use their own best judgment on management matters." Abercrombie v. Davies, 123 A.2d 893, 899 (Del. Ch. 1956), rev'd on other grounds, 130 A.2d 338 (Del. Super. Ct. 1957). Moreover, nothing in the record demonstrates that a delegation of authority in this context would "formally preclude the ... board from exercising its statutory powers and fulfilling its fiduciary duty." Grimes, 673 A.2d at 1214 (citation omitted). The board's 1976 resolution with respect to the Plan's self-insurance illustrates this conclusion. Therefore, contrary to the plaintiffs' contentions, the board could freely delegate its authority to administer and amend CW's retirement benefits plan appropriately.

2. Mr. Berner's Authority to Amend the Plan Pursuant to Board Delegation

Beyond the board of directors, the corporation may validly act through its directors and officers as authorized corporate agents. In general, an officer's powers stem from the organic law of the corporation, or a board delegation of authority which may be express or implied. 2 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations S 434, at 339 (perm. rev. ed. 1992). Express authority to act on behalf of the corporation is usually manifested through a statute, the certificate of corporation, the by-laws, or a board or shareholder action. Id. S 434, at 339-40; Petition of Mulco Prods., 123 A.2d 95, 103 (Del. Super. Ct.), aff'd sub nom., Mulco Prods., Inc. v. Black, 127

A.2d 851 (1956). Implied actual authority, which is express authority circumstantially proved, may be found through evidence as to the manner in which the business has operated in the past, the facts attending the transaction in question, circumstantial evidence of board declarations surrounding the given transaction, or the habitual usage or course of dealing common to the company. 2 Fletcher, supra, S 437.2, at 353; Mulco, 123 A.2d at 103. Similarly, authority will be implied when it is reasonably necessary and proper to effectuate the purpose of the office or the main authority conferred.2 Fletcher, supra, S 434, at 340.

Pursuant to these principles of corporate law, the undisputed facts show that Mr. Berner, the CEO and President of CW possessed the express authority to amend the Plan without the board's prior approval. The corporate by-laws, adopted by the board, affirmatively bestow on the CEO the authority to take "general and active control of [the corporation's] business and affairs," which specifically includes the power to fix employee compensation. App. at 441-43. Delaware courts have held that attendant to this unqualified grant of authority, the president as general manager commands the power to "do anything the corporation could do in the general scope and operation of its business." Phoenix Finance Corp. v. Iowa-Wisconsin Bridge Co., 16 A.2d 789, 793 (Del. Super. Ct. 1940); see also Mulco, 123 A.2d at 104. It certainly follows that the broad power to fix employee compensation subsumes the authority to amend a specific type of compensation-- retirement health benefits governed by ERISA -- and logic would consequently dictate that the board expressly approved the CEO's authority to create, administer, or amend CW's retirement plan. Indeed, Delaware courts have been receptive to this line of reasoning, and have generally upheld a general manager's action on behalf of the corporation unless it is "unusual" or "extraordinary." See 1 Ernest L. Folk, Folk on the Delaware General Corporation Law S142.6, at 6-7 (3d ed. 1997).

We once again pause to address plaintiffs' arguments against finding express authority vested in Mr. Berner pursuant to an express delegation by the board. Plaintiffs assert that although Mr. Berner expressly commands the

authority to "fix employee compensation," the termination of medical benefits would be an "extraordinary" exercise of authority that would require explicit board approval. Plaintiffs do not point to any record support for this contention other than the allegation that it would be "outside the ordinary course of business" for the CEO to undertake such an action. This argument is unavailing particularly in view of the board mandate allowing the CEO to fix employee compensation and the complete absence of any suggestion that the board intended Plan amendments to be subject to its prior approval. In fact, the board adopted the by-laws well before the Plan's creation and acted in a manner perfectly consistent with the assumption that the Plan was valid. If the board had considered the Plan's creation as a reasonable act without its prior authorization, then surely the board would not have considered the Plan's amendment to be so "extraordinary" that it was outside Mr. Berner's authority.

3. Mr. Berner's Delegation Under His Authority

As the record demonstrates, however, Mr. Berner did not amend the Plan, which leaves us with the necessity to decide whether another corporate officer or agent possessed the requisite amendatory authority. It is, of course, firmly established that an officer broadly charged with managing the affairs of a corporation impliedly possesses the authority to appoint subordinate agents under his control to act on behalf of the corporation. See 2 Fletcher, supra, S 503, at 598. Delaware is no stranger to this rule. See 8 Del. Code S 122(5); 1 Balotti & Finkelstein, supra, S 4.17. Nevertheless, the power of delegation is not without limits, and the language of case law generally focuses on whether the delegated authority involves "ministerial" functions or acts that require "the exercise of discretion" by the sub-agent. See 2 Fletcher, supra, S 503, at 598. As the very term "management" connotes, however, corporate officers and subordinate agents must be afforded some level of discretion when faced with the demands of supervising a modern corporation. Thus, given the "necessities of the case and usage," corporate law recognizes that many "discretionary" acts will be carried out by officers and other

13

subordinates. 1 Balotti & Finkelstein, supra, S 4.17, at 35 (citing 2 Fletcher, supra, S 495, at 580); see also Kelly v. Bell, 254 A.2d 62, 72 (Del. Ch. 1969), aff'd, 266 A.2d 878 (Del. 1970). The critical factors are often the complexity of the corporation, see Kelly, 254 A.2d at 72, the intent of the board, and the corporation's implied course of conduct. See 1 Balotti & Finkelstein, supra, S 4.17, at 35 (citing 2 William F. Fletcher, supra, SS 494-95).

These principles of corporate law, when applied to the record before us, lead us to conclude that Mr. Berner properly delegated to Mr. Ehinger, one of CW's Executive Vice Presidents, the authority to amend the Plan. It is not disputed that CW is a large, complex corporation with operations well beyond its facilities in New Jersey. While plaintiffs assert that the power to amend the Plan was outside Mr. Berner's authority to delegate because it was not "routine," we do not find this to be the case. To be sure, the Plan's amendment required some level of discretion on Mr. Ehinger's part, but this would not defeat a proper delegation by Mr. Berner in view of his authority. The by-laws specifically vest Mr. Ehinger, as Executive Vice President, with the authority to "perform all such duties and exercise all such powers as may be provided by ... the President." App. at 443. Certainly, such a duty would include significant changes to the Plan's retirement health benefits and there is no indication on the record that the board limited the Vice President's authority to "routine" matters that would not include significant Plan amendments. Moreover, the prior course of dealings between Mr. Berner, Mr. Ehinger, and the board -- none of which are disputed by the plaintiffs -- all show that Mr. Berner and the board were well aware that Mr. Ehinger established and administered the current Plan. In light of these undisputed facts, we conclude that the validity of the Plan's amendment did not depend upon the prior express approval of Mr. Berner in his capacity as CW's President and CEO.

The district court refused to find such a delegation of authority to Mr. Ehinger in fact at the summary judgment stage. It did so because, in its view, "issues of credibility" remain as to Mr. Ehinger's deposition testimony that he

14

had received an oral authorization by Mr. Berner to manage employee benefits. We therefore face the inescapable issue of deciding whether there is a "genuine issue of material fact" surrounding the delegation of amendatory authority from Mr. Berner to Mr. Ehinger. Fed. R. Civ. P. 56(c). A fact is "material" if, under the substantive law of the case, it is outcome determinative. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A "genuine" issue is one where a reasonable jury, based on the evidence presented, could hold in the nonmovant's favor with regard to that issue. Id. This formulation reflects the same standard as is applied in a directed verdict motion under Fed. R. Civ. P. 50(a), where the court inquires whether reasonable minds may differ as to the verdict. Id. at 250. Once the moving party has demonstrated that there is no genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Co., 475 U.S. 574, 586 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no"genuine issue for trial." Id. (citation omitted).

Notwithstanding this well settled law, federal courts have found difficulty in applying the summary judgment standard when faced with certain questions of credibility. See 10 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure S 2726, at 115 (2d ed. 1983). It is by now axiomatic that "a nonmoving party ... cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit to that effect." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Liberty Lobby, 477 U.S. at 256-57); see also Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1165 (3d Cir. 1990). On the other hand, certain scenarios may arise where a material fact cannot be resolved without weighing the credibility of a particular witness or individual -- such as when the defendant's liability turns on an individual's state of mind and the plaintiff has presented circumstantial evidence probative of intent. Williams, 901 F.2d at 460. In such a case, we have said that summary judgment is inappropriate because there is a sufficient quantum of evidence on either side for reasonable minds to differ and

15

therefore the issue is "genuine." Id. at 461; see also Hozier, 908 F.2d at 1165 ("[N]othing in Rule 56 prevents [the nonmoving party] from creating a genuine issue of material fact by pointing to sufficiently powerful countervailing circumstantial evidence."). Indeed, the Advisory Committee notes to the federal rules mirror this result. See Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e). But, as the Advisory Committee notes also indicate, it is important to emphasize that issues of credibility only defeat summary judgment "[w]here an issue of material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility." Id. (emphasis added). By logical implication from this rule, if a moving party has demonstrated the absence of a genuine issue of material fact -- meaning that no reasonable jury could find in the nonmoving party's favor based on the record as a whole -- concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 256-57 (citation omitted). Thus, summary judgment is particularly appropriate where, notwithstanding issues of credibility, the nonmoving party has presented no evidence or inferences that would allow a reasonable mind to rule in its favor. In this situation, it may be said that the record as a whole points in one direction and the dispute is not "genuine." Matsushita, 475 U.S. at 586.

The record here is replete with evidence showing that Mr. Berner had in fact orally delegated the authority to amend and administer the Plan to Mr. Ehinger, even apart from Mr. Ehinger's own testimony to that effect. Mr. Sprigle, CW's other Executive Vice President, testified under oath that based on his experience in the corporation Mr. Berner had divided responsibilities among Vice Presidents and that Mr. Ehinger was delegated matters relating to human resources and plan administration. App. at 249. Similarly, Mr. Carr, the corporation's labor counsel, submitted an affidavit showing that he always understood Mr. Ehinger to command operating authority with respect to Plan amendments, based on a delegation from Mr. Berner. App. at 420. Moreover, it is undisputed that both the human

16

resources department and welfare benefits group reported directly to Mr. Ehinger and not to Mr. Berner. App. at 109–10. It is also not disputed that Mr. Ehinger had previously amended the Plan and reported to Mr. Berner about Plan administration. App. at 207.

Against all these affidavits, deposition testimony, and undisputed facts, the plaintiffs, who would bear the burden of proof on this issue at trial,[5] have not set forth even the slightest quantum of evidence or reasonable factual inference to support a jury finding that Mr. Ehinger had no authority to amend Plan benefits. Nor does the record reflect any reasonable inference, whether through circumstantial evidence or otherwise, that Mr. Ehinger did not act under Mr. Berner's oral delegation of authority. While the plaintiffs argue that the absence of a written delegation creates an inference against authority, corporate law clearly allows for oral delegations of authority, see 2 Fletcher, supra, S 444, at 398 (citing Hessler, Inc. v. Farrell, 226 A.2d 708 (Del. 1967)), and the plaintiffs have offered no reason why this lack of writing would seem suspicious. As a result, we conclude that plaintiffs did not raise a "genuine" issue as to the delegation of authority, even on an implied basis, to Mr. Ehinger regarding Plan amendments.[6] The district court's conclusion that the

_____

5. As CW correctly points out, because plaintiffs seek affirmative relief in
this action, they must establish the invalidity of the amendment in 1983 under both ERISA law, see Hozier, 908 F.2d at 1163, and under general corporate law. See 2 Fletcher, supra, S 437.3.

6. We recognize that in certain situations discovery for a nonmoving party may be particularly difficult where the party seeking summary judgment has exclusive possession of all the material facts, thereby diminishing the nonmovant's ability to show a genuine issue. See, e.g., 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure S 2740, at 536–37 (2d ed. 1983); 6 James W. Moore, Moore's Federal Practice S 56.24, at 796 (2d ed. 1996). The plaintiffs have never contended, however, that they faced such a problem during any discovery phase of litigation. Cf. Fed. R. Civ. P. 56(f) (allowing a district
court to, among other things, "refuse application for judgment" if it appears "from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition"). Indeed, we note that the plaintiffs

17

evidence of delegated authority to Mr. Ehinger by Mr. Berner consisted solely of Mr. Ehinger's testimony is too narrow a view, based not only on the evidence in the record, but also on the realities of modern corporations and applicable corporate law.

B. Did the Persons with the Necessary Authority
       Actually Approve the Amended Plan?

Having identified the persons with the necessary authority to amend CW's retirement benefits Plan, we must decide whether a person so situated actually exercised that authority in 1983. The record, as described above, shows that the analysis must focus on the authority delegated to Mr. Ehinger in his capacity as the corporation's Executive Vice President. We now turn to that record.

It is not disputed that Mr. DuBois, the Corporate Manager for Benefits, and Mr. Carr, CW's labor counsel, initially drafted the 1983 SPD amendment at issue providing for the termination of health benefits for a closed plant's retirees. As the parties agree, it is quite clear that if Mr. DuBois and Mr. Carr acted without the specific authorization of Mr. Ehinger, then the SPD amendment, without more, cannot be considered a valid corporate act on any delegation theory. The question then is primarily factual in nature -- did Mr. Ehinger actually authorize the amendment to the Plan in 1983 terminating benefits? Once again, the district court denied summary judgment to CW on this question because, in its view, "the only evidence in the record on this issue is the deposition testimony of Ehinger [and] questions of credibility remain."

_____

exercised their right to cross-examine most material witnesses during their depositions. Consequently, the defendant was entitled to summary judgment in its favor notwithstanding the "desire... for an opportunity to cross examine the [defendant's] witnesses in the hope of turning up something ..., at least in the absence of a showing, such as is contemplated by Rule 56(f), that all of the facts were necessarily within the exclusive knowledge of the plaintiffs and not accessible to the defendants." United States ex rel. Kolton v. Halpern, 260 F.2d 590, 591 (3d Cir. 1958) (Maris, J.).

18

We reiterate at the outset that the burden of showing the unauthorized nature of the SPD amendment falls squarely on the plaintiffs. See Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1163 (3d Cir. 1990). In support of its motion for summary judgment, CW points to Mr. Ehinger's testimony that he approved the SPD termination language during its drafting. App. at 207-208. In addition to the deposition testimony of Mr. Ehinger, Mr. Carr also submitted an affidavit that Mr. Ehinger approved the decision to terminate benefits. App. at 421. Further, it is not disputed that the decision to amend the Plan was the result of similar issues raised by litigation that occurred over the earlier closing of CW's Marquette facility in Cleveland. App. 35. Indeed, plaintiffs do not deny that Mr. Ehinger and the benefits group played a significant role in that litigation and anticipated a change in the present Plan description to avoid future litigation. App. at 115.

Against this evidence, plaintiffs point to only two relevant instances in the record which they claim would allow a reasonable jury to conclude in their favor and therefore render the issue genuine. First, plaintiffs again emphasize that there is no documentation -- whether a memorandum, resolution, or otherwise -- reflecting Mr. Ehinger's actual exercise of authority. As we have stated before, however, the law recognizes an oral delegation or exercise of authority, which may be proved by parol evidence. See, e.g., 2 Fletcher, supra, S 444, at 398 (citing Hessler, Inc. v. Farrell, 226 A.2d 708 (Del. 1967)); Restatement (Second) of Agency SS 26, 33 (1958). Thus, while we agree that CW's record keeping is not a paragon of desirable corporate practice, the plaintiffs have offered no reason why the absence of documentation, when the law requires none, should be subject to suspicion or provide a basis for a reasonable inference in their favor, particularly in view of the corporation's established practices to the contrary. Cf. Ansin v. River Oaks Furniture, Inc., 105 F.3d 745, 755 (1st Cir. 1997) (where a transaction would ordinarily leave a "heavy paper trial," an inference of fact arises from a "complete absence of contemporaneous documentation"); Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1165-66 (3d Cir. 1990) (where a memorandum written in contemplation of a merger does not include a new ERISA

19

benefits schedule, a factual inference is created because the author had personal knowledge of the transaction and the omission seemed "odd" from the circumstances of the case). But on the undisputed evidence of CW's corporate practice, we conclude that the absence of record documentation reflecting the nature and exercise of Mr. Ehinger's authority is not sufficiently probative that it provides, without more, a basis for a reasonable inference in favor of the plaintiffs.

Plaintiffs also point to Mr. Ehinger's deposition testimony in 1986 where he stated:

> It had been the policy of the Curtiss-Wright Corporation, which was put in practice in closing the East Paterson facility in 1971 ... [and] the Marquette facility, that post-retirement insurance would terminate at the closing of the facility.
>
> I expected my personnel to reflect such policy in such documents. I did not myself read the individual policies or question them where does it say what in it.

App. at 136 (emphasis added by plaintiffs). Plaintiffs argue that Mr. Ehinger's admission of not having read the individual benefits policies supports their contention that he did not specifically authorize the Plan amendment in 1983. We believe plaintiffs' conclusion is a non sequitur. Simply because Mr. Ehinger did not read the individual retirement health benefits policies does not mean that he did not authorize the change in the language of the amendment. In fact, Mr. Ehinger specifically states that he "expected [his] personnel to reflect such[a] policy in [the] documents," which at least raises an inference that he authorized any changes in the Plan that would conform to his expectations. Id. We therefore do notfind this deposition testimony to create a genuine issue of material fact in the plaintiffs' favor.

Beyond these two arguments, which lack merit, plaintiffs do not identify any other instance in the record developed on remand that would render the question of Mr. Ehinger's exercise of authority a "genuine" dispute. This is not a case where a material issue of fact "cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility." Advisory Committee Notes to Fed.

20

R. Civ. P. 56(e). The record points in but one direction and, as a result, summary judgment for CW was proper.

III. Ratification

In view of our conclusions, we need not address the district court's reliance on the doctrine of ratification and its application to this case.'

IV. Conclusion

For the aforementioned reasons, the judgment of the district court in Curtiss-Wright's favor will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit